1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES  DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

OKINAWA DUGONG (Dugong Dugon), et al.,

                Plaintiffs,

    v.

ROBERT GATES, et al.,

                Defendants.

_____/

No. C 03-4350  MHP

**MEMORANDUM & ORDER**
**Re: Cross-Motions for Summary Judgment**

       Plaintiffs, consisting of the Okinawa dugong, three individual Japanese citizens, and six American and Japanese environmental associations, brought this action against defendants Robert Gates, Secretary of Defense, and the United States Department of Defense ("DOD") for violations of section 402 of the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470a-2, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Plaintiffs allege that defendants have approved the plans for construction of the Futenma Replacement Facility ("FRF")—a military air station off the coast of Okinawa Island—without taking into account the effect of the military facility on the Okinawa dugong, a marine mammal of cultural and historical significance to the Japanese people.  Now before the court are the parties' cross-motions for summary judgment. Having considered the arguments and submissions of the parties and for the reasons set forth below, the court enters the following memorandum and order.

BACKGROUND

I.     The Okinawa Dugong

The dugong (*Dugong dugon*) is a species of marine mammal related to the manatee.  Joint Statement of Undisputed Facts ¶ 2 (hereinafter "Undisputed Facts").  The waters surrounding Okinawa Island are habitat for the dugong whose range extends the costal and territorial waters of many countries in the Far East.  Id.  The greatest population concentrations occur in Australia, the Philippines, and Thailand, and Japan is at the northern edge of the dugong's range.  Id.  The dugong is classified as vulnerable by the World Conservation Union (IUCN) due to habitat destruction and degradation, as well as human exploitation.  Id.  The Japan Ministry of the Environment recently listed the dugong as critically endangered in Japan.  Id.

Dugong are significant in Okinawan culture.  Id. ¶ 3.  They are associated with traditional Okinawan creation mythology, sometimes being considered the progenitor of the local people.  Id.  Because of its cultural significance, the dugong is listed as a protected "natural monument" on the Japanese Register of Cultural Properties, established under Japan's "Law for the Protection of Cultural Properties."  Id.  Henoko Bay, on the northeast coast of Okinawa Island, is dugong habitat. Id. ¶ 4.  There are many species of seagrass found in the shallow waters of Henoko Bay.  Id.  These seagrass beds are dugong feeding grounds, and dugong have been observed to feed in and traverse Henoko Bay.  Id.  The U.S. military's Camp Schwab—where defendants propose to construct a military facility to replace an existing air station—are located adjacent to and in Henoko Bay.  Id.


II.     The Futenma Replacement Facility ("FRF")

The United States has maintained a military presence on the Island of Okinawa, Japan, since the end of World War II in 1945.  Undisputed Facts ¶ 5.  After the U.S. military occupation of Japan ended, the Government of Japan permitted the United States to administer Okinawa pursuant to international agreements, while Japan retained residual sovereignty over Okinawa.  Id.  In November 1969, President Nixon and Prime Minister Sato agreed to terminate the United States' administrative control of Okinawa without detriment to the mutual defense interests of both

2

governments. Defs.' Mem. at 7. United States administration of Okinawa officially ended in 1972 when the two governments signed the "Agreement Between the United States and Japan Concerning the Ryukyu Islands and the Daito Islands" ("Agreement"). Undisputed Facts ¶ 6. Okinawa is one island in the Ryukyu Island chain that now comprises the Prefecture of Okinawa. Id. Under the Agreement, the United States relinquished to Japan all administrative rights and interests it had over the Okinawa Islands. Id. Japan assumed full responsibility and authority for the exercise of any and all powers of administration, legislation, and jurisdiction over the territory and inhabitants of the Islands, and Okinawa regained its pre-World War II status as Japan's 47th prefecture. Id.

Under Article III of the Agreement, Japan granted the United States exclusive use of facilities and areas in the Islands in accordance with the "Treaty of Mutual Cooperation and Security" ("Treaty") and the "Status of Forces Agreement" ("SOFA"). Id. The Treaty and SOFA were both signed in 1960, but did not take effect until U.S. administration of Okinawa ended in 1972. Defs.' Mem. at n.5. SOFA is a bilateral agreement between the United States and Japan entered into pursuant to Article VI of the Treaty which states, "[f]or the purpose of contributing to the security of Japan and the maintenance of international peace and security in the Far East, the United States of America is granted the use by its land, air and naval forces of facilities and areas in Japan." Pls.' Exhs. 14, 15. The Treaty and SOFA create the bilateral Security Consultative Committee ("SCC") consisting of four members—the Japanese Minister of Foreign Affairs, the Japanese Minister of Defense, the United States Secretary of Defense, and the United States Secretary of State. Id.; Defs.' Mem. at n.7. SOFA instructs that the SCC "shall serve as the means of consultation in determining the facilities and areas in Japan which are required for the use of the United States in carrying out the purposes of the [Treaty]." Pls.' Exh. 15, SOFA, Art. XXV.

The United States Department of Defense ("DOD") maintains and controls a number of military bases on Okinawa, including the Marine Corps Air Station Futenma ("MCAS Futenma") which provides services and materials to support Marine Corps aircraft operations. Undisputed Facts ¶ 7. MCAS Futenma is located in Ginowan City and due to social and economic changes, is now completely surrounded by urban development. Moriya Dec. ¶ 3. Japanese officials have called

3

for its closure and relocation to a more suitable site in order to ease the health and safety burdens on the citizens of Ginowan City.  Id. ¶ 3, 5.  At the same time, American officials have also called for the relocation of MCAS Futenma citing a desire to relocate military activities to a less congested area.  Lawless Dec. ¶ 4.  The project to relocate and replace MCAS Futenma is referred to as the Futenma Replacement Facility ("FRF") project.  Under the auspices of the SCC, the United States and Japan formed the bilateral Special Action Committee on Okinawa ("SACO") to develop recommendations for the SCC on ways to consolidate, realign, and reduce U.S. military facilities and to adjust operational procedures of U.S. forces in Okinawa.  Undisputed Facts ¶ 8.  SACO recommendations can only be adopted with bilateral SCC approval.  Id.  In December 1996, the SCC members approved the SACO recommendation to replace MCAS Futenma with an offshore, sea-based facility somewhere off the east coast of Okinawa.  Id.; Pls.' Exh. 13, SACO Final Report.

The final site selection and design of the FRF depended upon, among other considerations, U.S. operational requirements which the DOD established in September 1997.  Undisputed Facts ¶¶ 8, 10; Pls.' Exh. 16.  The operational requirements were developed with the involvement of representatives of at least eight DOD sub-agencies and were approved by high-ranking officials in the U.S. Army, Navy, and Marines.  Undisputed Facts ¶ 10.  The 1997 operational requirements established parameters for any replacement facility Japan would construct and provide to the U.S. in accordance with the Treaty and SOFA.  Id.  While Japan would select the ultimate site of the FRF and fund and carry out its construction, DOD would oversee and monitor its design, engineering, and construction to ensure that the FRF met U.S. operational requirements.  Id. ¶¶ 10, 11, 13.

In August 2000, the Consultative Body of Futenma Relocation, composed of local and national officials from the Government of Japan, was established to produce a "Basic Plan" to identify the location, size, construction method, and runway orientation of the FRF.  Id. ¶ 11.  The Basic Plan, issued by the Consultative Body in July 2002, approved the decision to relocate MCAS

4

Futenma to Nago City's Henoko District, immediately offshore from Camp Schwab. Id. As already mentioned, the U.S. military's Camp Schwab is located adjacent to and in Henoko Bay which is a dugong habitat.

Although SACO's initial recommendation called for the construction of the FRF as a sea-based facility, those plans were officially abandoned on October 29, 2005 when the SCC issued the "Alliance Transformation and Realignment Agreement" ("ATARA"). Id. ¶ 12; Pls.' Exh. 18. The ATARA stipulated that the U.S. and Japan would locate the FRF in an "L-shaped" configuration that combined the shoreline areas of Camp Schwab and adjacent water areas of Henoko and Oura Bays. Undisputed Facts ¶ 12. Although Japan suggested locating the FRF entirely on the land area of Camp Schwab and/or the adjacent Central Training Area, DOD's operational requirements made such an arrangement impossible. Id. The site selected to locate the FRF, as described in the ATARA, did meet DOD operational and safety concerns. Id. The ATARA also directed the respective staffs of both governments to develop plans for the initiatives agreed upon, including implementation schedules, no later than March 2006. Id.

On May 1, 2006, following a meeting of the SCC that included U.S. Secretary of Defense Donald Rumsfeld in addition to U.S. Secretary of State Condoleezza Rice and the other SCC members, Japan and the United States issued an agreement entitled "United States-Japan Roadmap for Realignment Implementation" ("2006 Roadmap"). Id. ¶ 13; Pls.' Exh. 19. The 2006 Roadmap is a joint plan of action between the United States and Japan and reflects bilateral agreement on the initiatives set forth in the ATARA, including the plans for the Futenma Relocation Facility. Undisputed Facts ¶ 13. The Roadmap establishes that Japan will construct the FRF in a location and configuration that combines the Henoko-saki (Henoko Point) portion of the Camp Schwab installation and adjacent water areas of Oura and Henoko Bays. Id. Instead of an "L-shaped" runway as stipulated in ATARA, the Roadmap stipulates a "V-shaped" runway which will be partially built on landfill extending into Oura and Henoko Bays. Id. Each runway will be 1,600 meters in length plus 200 meters as "overrun" areas. Id.

5

The 2006 Roadmap, like the ATARA, is a bilateral executive agreement between two sovereign nations which covers a number of restationing and military realignment issues in addition to the planned closure, return, and relocation of MCAS Futenma. Id. ¶ 14. The agreements reached in the Roadmap have received needed approvals at the national levels of both governments, but the Government of Japan is still working to obtain needed approvals from affected local and prefectural governments. Id. Both the U.S. and Japanese governments are now cooperating to implement the Roadmap, and construction of the FRF is targeted for completion in 2014. Id. The process has already begun in the form of surveys and testing by the Japanese government which, under Japanese law, is required to conduct an environmental impact assessment before construction of the FRF begins. Moriya Dec. ¶¶ 13–18.

III.    Procedural History

Plaintiffs filed their complaint on September 25, 2003 and amended the complaint on November 24, 2003. Defendants filed an answer on December 9, 2003 and moved to dismiss the first amended complaint on May 17, 2004 for failure to state a claim and for lack of subject matter jurisdiction. Because both parties submitted matters beyond the pleadings, the court converted defendants' motion to dismiss into a motion for summary judgment. The court issued its order on March 2, 2005, addressing the narrow issue of whether the National Historic Preservation Act ("NHPA") applies to the circumstances of this case. Dugong v. Rumsfeld, 2005 WL 522106. In that order, the court denied defendants' motion and held that the Okinawa dugong is "property" protected under Japan's equivalent of the National Register. Id. at 12. The court withheld judgment and ordered additional discovery on the issues of whether defendants' activities related to the Futenma Replacement Facility constitute an "undertaking," whether the activities "may directly and adversely affect" the dugong, and whether defendants have "taken into account" the effects of the replacement facility on the dugong. Id. at 16, 7, 18.

Following the announcement of the 2006 Roadmap for the FRF, plaintiffs filed a second amended complaint on July 19, 2006. Defendants filed an answer on August 1, 2006. To avoid a

6

dispute over pre-trial discovery, the DOD compiled four separate administrative records, each covering a different aspect of the planning effort for the FRF. Now before the court are the parties' cross-motions for summary judgment on the issue of whether defendants have taken into account the effects of the Futenma Replacement Facility on the Okinawa dugong, as required under section 402 of the National Historic Preservation Act.

LEGAL STANDARD

I.       Summary Judgment

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. Id.; Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994). The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

The moving party may "move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof." Fed. R. Civ. P. 56(a). "Supporting and opposing

affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).

## II.    National Historic Preservation Act

Congress enacted the NHPA in 1966 with the goal of preserving the "historical and cultural foundations of the Nation . . . in order to give a sense of orientation to the American people." 16 U.S.C. § 470(b)(2). The Act establishes that "[i]t shall be the policy of the Federal Government, in cooperation with other nations and in partnership with the States, local governments, Indian tribes, and private organizations and individuals to . . . provide leadership in the preservation of the prehistoric and historic resources of the United States and of the international community of nations." Id. § 470-1(2).

Under section 106 of the NHPA, federal agencies are required, when undertaking any federally assisted action *within* the United States, to "take into account the effect of the undertaking on any district, site, building, structure, or object that is included or eligible for inclusion in the National Register."[1] Id. § 470f. The NHPA delegates to the Secretary of the Interior authority to expand and maintain a National Register of Historic Places. Id. § 470a(a)(1)(A). The NHPA also establishes the Advisory Council on Historic Preservation ("ACHP"), Id. § 470i, and delegates to the ACHP authority to promulgate regulations necessary to implement the section 106 take into account process, Id. § 470s. The section 106 regulations promulgated by the ACHP set forth a multi-step process by which an agency takes into account the effects of an undertaking. A basic review process includes: (1) identification of historic properties and consulting parties, see 36 C.F.R. §§ 800.2, 800.4; (2) notice to consulting parties, including the public, of initiation of consultation, see id. §§ 800.2(d), 800.3(e)–(f); (3) assessment as to whether the project will or will not have an adverse effect on the historic property, see id. § 800.5(a)–(b); (4) notice to consulting parties of finding of no adverse effect and opportunity for consulting parties to respond, see id. § 800.5(c); and, if adverse effects are found, (5) continued consultation with the public and other parties to develop and

8

evaluate alternatives or modifications to the undertaking that could avoid or mitigate the adverse effects, see id. §§ 800.5(d)(2), 800.6. An agency's findings and determinations must be sufficiently documented to enable reviewing parties to understand their basis, see id. § 800.11, and must describe, for example, the undertaking, id. § 800.11(d)(1); its effects on the historic property, id. § 800.11(e)(4); and if appropriate, any conditions or future actions to avoid, minimize or mitigate the adverse effects, id. § 800.11(e)(5).

In 1980, Congress amended the NHPA to implement the United States' participation in the Convention Concerning the Protection of the World Cultural and National Heritage ("World Heritage Convention"). Pub. L. 96–515. The amendment added to the NHPA section 402 governing undertakings *outside* the United States. Section 402, therefore, is the international counterpart to section 106 governing domestic undertakings. The full text of section 402 is as follows:

> Prior to the approval of any Federal undertaking outside the United States which may directly and adversely affect a property which is on the World Heritage List or on the applicable country's equivalent of the National Register, the head of a Federal agency having direct or indirect jurisdiction over such undertaking shall take into account the effect of the undertaking on such property for purposes of avoiding or mitigating any adverse effects.

16 U.S.C. § 470a-2. The Secretary of the Interior is charged with directing and coordinating United States participation in the World Heritage Convention, and Congress has delegated authority to the Secretary to nominate properties to the World Heritage List. Id. § 470a-1. The ACHP regulations implementing section 106 domestic undertakings were first adopted in 1974, and thus, were in effect at the time Congress passed section 402 governing foreign undertakings. The domestic regulations, however, do not apply directly to section 402 and no separate implementing regulations have been promulgated for that section.

Under NHPA section 110 each federal agency "shall establish, . . . in consultation with the Secretary [of the Interior], a preservation program for the identification, evaluation, and nomination to the National Register of Historic Places, and protection of historic properties." Id. § 470h-2(a)(2). An agency's preservation program under section 110 "shall ensure," among other things, "that the preservation of properties not under the jurisdiction or control of the agency, but subject to be

9

potentially affected by agency actions are given full consideration in planning." Id. § 470h-2(a)(2)(C). Section 110 also requires that an agency's preservation program include procedures for compliance with the domestic section 106 take into account process, id. § 470h-2(a)(2)(E), and that the agency's section 106 procedures are consistent with the ACHP regulations discussed above, id. § 470h-2(a)(2)(E)(I). The Secretary of the Interior is authorized to promulgate guidelines to assist other federal agencies in fulfilling responsibilities under section 110. Id. § 470a(g). Under this authority, the Secretary in 1998 published guidelines which "have no regulatory effect," but nevertheless provide "formal guidance to each Federal agency on meeting" their responsibility under section 110 to establish a preservation program. 63 Fed. Reg. 20496–20508, 20496 (April 24, 1998).

III.   Administrative Procedures Act

Because the NHPA does not provide an independent basis for judicial review of agency actions, an aggrieved party must pursue its remedy under the Administrative Procedure Act ("APA"). San Carlos Apache Tribe v. United States, 417 F.3d 1091, 1099 (9th Cir. 2005). The APA authorizes judicial review of final agency actions "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Final agency actions are defined as actions which "mark the consummation of the agency's decision making process," defined as not "merely tentative or interlocutory [in] nature," and which determine "rights or obligations" or from which "legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177–178 (1997) (internal quotations and citations omitted). Ripeness of agency action for judicial review turns on the "fitness of the issue for judicial decision" and the "hardship to the parties of withholding court consideration," but in close questions, courts are "guided by a presumption of reviewability." Ciba-Geigy Corp. v. EPA, 801 F.2d 430, 434 (D.C. Cir. 1986); Nat'l Mining Ass'n v. Fowler, 324 F.3d 752, 757 (D.C. Cir. 2003). An agency action or decision may be set aside if the court finds it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and a court may "compel agency action unlawfully withheld or unreasonably delayed," id. § 706(1). A court's

inquiry must be "searching and careful," but the standard of review is ultimately narrow.  Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989) (internal quotations and citations omitted).

DISCUSSION

Defendants assert five bases for barring the court's review including: 1) lack of "final agency action" as required under the APA; 2) plaintiffs' lack of standing; 3) non-ripeness of the claims for judicial review; 4) act of state doctrine; and 5) failure to join the Government of Japan as a necessary and indispensable party under Rule 19 of the Federal Rules of Civil Procedure.  Plaintiffs argue that the court has a proper basis to review the matter and that they are entitled to summary judgment on the substantive issue of whether defendants have complied with the NHPA.  They argue as a threshold matter that section 402 of the NHPA applies to the circumstances of this case because DOD's involvement in the FRF constitutes a "federal undertaking" which "may directly and adversely affect" the Okinawa dugong, a "property" protected under Japan's equivalent of the National Register.  Compliance with section 402, plaintiffs argue, requires defendants to "take into account" the effects of the FRF on the Okinawa dugong by, among other things, consulting with the public and interested organizations and taking measures to mitigate or avoid adverse effects. Defendants assert that in the absence of any standards or regulations directly applicable to foreign undertakings, the DOD may determine, in the reasonable exercise of its discretion, what requirements are necessary to comply with section 402.

I.       Limitations on Judicial Review

   A.       Final Agency Action Under the APA[2]

Defendants argue that this case does not involve "agency action" that is "final" for purposes of triggering the court's review under the APA.  The APA authorizes a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," to bring suit seeking judicial review of that agency action.  5 U.S.C. § 702.  Agency action is statutorily defined

to "include[] the whole or part of an agency rule, order, license, sanction, relief or the equivalent or denial thereof, or failure to act." Id. §§ 551(13), 701(b)(2). According to the Supreme Court, the five categories—rule, order, license, sanction and relief, as they are defined in 5 U.S.C. sections 551(4), (6), (8), (10) and (11)—each involve "circumscribed, discrete agency actions." Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 62 (2004) (hereinafter "SUWA"). The terms following those five categories—the "equivalent . . . thereof," "denial thereof," and "failure to act"—are not defined in the APA. Id. "But an 'equivalent . . . thereof' must also be discrete (or it would not be equivalent), and a 'denial thereof' must be the denial of a discrete listed action (and perhaps denial of a discrete equivalent)." Id. "The final term in the definition [of agency action], 'failure to act,' is in [the Supreme Court's] view properly understood as a failure to take an *agency action*—that is, a failure to take one of the agency actions (including their equivalents) earlier defined in § 551(13)." Id. Thus, a claim under 5 U.S.C. § 706(1) to compel agency action unlawfully withheld or unreasonably delayed "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." Id. at 64. The requirement of discrete agency action "rule[s] out several kinds of challenges," including "broad programmatic attack[s]," that "entangle[]" a court in "abstract policy disagreements" requiring it to "enter general orders compelling compliance with broad statutory mandates." Id. at 64, 66; see also Center for Biological Diversity v. Veneman, 394 F.3d 1108 (9th Cir. 2005).

In this case, plaintiffs allege that DOD has approved the 2006 Roadmap, including plans to construct the Futenma Replacement Facility, without having taken into account the effects of the facility on the Okinawa dugong. Plaintiffs allege that this failure to take into account (1) is a failure to take agency action required under section 402 of the NHPA and (2) constitutes agency action that is unlawfully withheld and/or unreasonably delayed. Second Amended Complaint, Prayer for Relief ¶ 3. Plaintiffs ask this court, under its authority in 5 U.S.C. section 706(1), to compel defendants to comply with the take into account procedures[3]. Id. The court agrees with plaintiffs that DOD's obligation to take into account is a discrete agency action that is non-discretionary and specific. NHPA section 402 states that a federal agency "*shall*" take into account the effect of an undertaking

*specifically* "for the purpose of avoiding or mitigating any adverse effects." 16 U.S.C. § 470a-2. Taking into account is discrete, required agency action, and therefore, the failure to take into account is also agency action reviewable under the APA. Far from launching a "broad programmatic attack" that requires the court to enter a "general order compelling compliance with broad statutory mandates," plaintiffs complain of a circumscribed, discrete agency action mandated by a specific provision of the NHPA. This duty to take into account relates to how a specific DOD facility, located at a specific site on the coast of Okinawa and configured in a specific pattern, will adversely affect the Okinawa dugong, a specific property of cultural and historic significance.

Plaintiffs make a separate, but related argument that the 2006 Roadmap is also agency action for purposes of APA review. See Pls.' Motion to Strike. Although DOD's participation in and approval of the 2006 Roadmap are, in a colloquial sense, "actions" taken by a federal agency, they are not "agency actions" for purposes of the APA. As the court explains in the standing analysis that follows, plaintiffs do not "suffer[ ] a legal wrong" and are not "adversely affected or aggrieved" simply by virtue of DOD's approval of design plans for construction of the Futenma Replacement Facility. Instead, plaintiffs' injury is a procedural injury caused by DOD's participation in and approval of the Roadmap, *without having taken into account* the effects of the facility construction on the Okinawa dugong. The relevant agency action which causes plaintiffs to suffer a legal wrong and which the court has authority to review, is the failure to take into account, not the approval of the Roadmap or the design and construction of the FRF.

DOD's approval of the Roadmap, however, *is* relevant for the court's analysis in determining whether the failure to take into account is agency action that is "*final*." In this case, the NHPA does not provide an independent basis for judicial review of agency action, and therefore, review is only proper if the agency action plaintiffs complain of is final. 28 U.S.C. § 704; SUWA, 542 U.S. at 61–62 ("Where no other statute provides a private right of action, the 'agency action' complained of must be '*final* agency action.'"). "As a general matter, two conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decisionmaking process, . . . [and] it must not be of a merely tentative or interlocutory nature. And second, the

13

1　action must be one by which rights or obligations have been determined, or from which legal

2　consequences will flow." Bennett v. Spear, 520 U.S. 154, 177–178 (1997) (internal quotations and

3　citations omitted). The finality requirement is to be applied in a "flexible" and "pragmatic" way,

4　and courts are "guided by a presumption of reviewability." Abbott Laboratories v. Gardner, 387

5　U.S. 136, 149–52 (1967).

6　　　　That DOD has not taken into account the effects of the military facility on the dugong, yet

7　has already established operational requirements which the facility must satisfy and has also

8　approved the Roadmap containing final plans for the facility's design and construction, implies that

9　the failure to take into account is "final" for purposes of triggering review under the APA. Under

10　the first prong of Bennett, the Roadmap is not tentative or interlocutory in nature. As already

11　discussed, the Roadmap is the final agreement between the United States and the Government of

12　Japan marking the consummation of years of negotiation and planning. Defendants argue that the

13　Roadmap is merely a "general commitment of the [United States Government] to commence a series

14　of planning efforts　. . . to realign the United States-Japan military and security forces in the

15　Western Pacific Ocean." Defs.' Reply at 4. The court does not agree with this overly broad

16　characterization. Far from establishing a mere framework to commence planning efforts, the

17　Roadmap contains detailed specifications for the FRF including where and how it will be built, when

18　it is expected to be completed, how much it will cost, and the number of personnel that will be

19　relocated there once it is operational. Planning efforts have not just recently commenced. Rather,

20　those efforts have been underway for several years and have now been consummated in a formal

21　agreement to move forward with the construction of the FRF.

22　　　　Under the second prong of Bennett, the Roadmap is an agreement by which rights and

23　obligations are determined and from which legal consequences will flow. The Roadmap was

24　approved by the Secretary of Defense and embodies DOD's formal decision concerning final plans

25　for the FRF. In its March 2005 order, the court held that DOD's actions in 1997 establishing

26　operational requirements for the FRF provided finality triggering judicial review. Dugong, 2005

27　WL 522106 at 17. The court stated that the establishment of operational requirements "triggered

28

14

1    important legal consequences, because they established the benchmark by which" the ultimate

2    decision to approve or reject the final implementation plans would be judged.  Id.  Since the court's

3    March 2005 order, the final implementation plans have in fact been approved and the earlier

4    established operational requirements have in fact been incorporated into those final plans.  Just as

5    DOD's earlier action establishing operational requirements provided finality triggering the court's

6    review in 2005, DOD's more recent action approving the 2006 Roadmap also provides finality

7    triggering the court's review now.

8         Finally, then, as now, the court is "guided by the presumption of reviewability and the risk of

9    irreparable harm."  Id.  Any question regarding final agency action, therefore, should be resolved in

10   favor of the plaintiffs.  Moreover, as the court explains in Part III below, NHPA section 402 imposes

11   an obligation to take into account within a certain time frame—that is, "*[p]rior to the approval* of

12   any Federal undertaking."  16 U.S.C. § 470a-2 (emphasis added).  As explained in Part II below,

13   defendants concede that approval of the 2006 Roadmap constitutes approval of a federal undertaking

14   for purposes of triggering obligations under NHPA section 402.  The failure to take into account,

15   therefore, can never have any more finality than it does now.  The court concludes that DOD's

16   failure to take into account pursuant to NHPA section 402 is agency action, and that the failure to

17   take into account is final.

18

19        B.    Standing

20        To demonstrate standing under Article III's case-or-controversy requirement, a litigant must

21   show: (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or

22   imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action

23   of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be

24   redressed by a favorable decision.  Nuclear Info. & Resource Service v. Nuclear Regulatory

25   Comm'n, 457 F.3d 941, 949 (9th Cir. 2006); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–561

26   (1992).  In addition to the Article III constitutional requirements, a litigant must satisfy additional

27   prudential standing requirements which, under the APA, requires: (1) a final agency action (which

28

15

the court has discussed above and has resolved in favor of plaintiffs); and (2) an injury falling within the "zone of interests" protected by the statutory provision the plaintiff claims was violated. <u>Nuclear Info.</u>, 457 F.3d at 950. The party invoking federal jurisdiction bears the burden of establishing the requirements for standing, which on a motion for summary judgment, must be supported by affidavit or other evidence of specific facts the court assumes to be true. <u>Lujan</u>, 504 U.S. at 561. This action involves three groups of plaintiffs—the Okinawa dugong, three individual Japanese citizens, and six environmental organizations. The court will address the standing of each group in turn.

### 1. Okinawa Dugong

The lead plaintiff that lends its name to this action is the Okinawa dugong, a marine mammal related to the manatee. The Ninth Circuit has held that although Article III does not prevent Congress from authorizing suits in the name of an animal, Congress did not in fact do so under the APA. <u>Cetacean Community v. Bush</u>, 386 F.3d 1169 (9th Cir. 2004). Standing under the APA is conferred on "persons" statutorily defined as "an individual, partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C. §§ 551(2), 701(b)(2). The Ninth Circuit in <u>Cetacean</u> declined to expand this basic definition to include animals such as whales, porpoises and dolphins. <u>Id.</u> at 1178. Plaintiffs concede that under <u>Cetacean</u>, the Okinawa dugong is an animal that does not have standing to assert this action under the APA for violations of the NHPA. Accordingly, the Okinawa dugong is dismissed.

### 2. Individuals

The three individual Japanese citizens allege that they have been harmed by DOD's failure to follow procedures required under the NHPA. Because procedural injury alone is insufficient to establish an injury in fact for purposes of standing, a plaintiff must show that "the procedures in question are designed to protect some threatened concrete interest . . . that is the ultimate basis of his standing." <u>Lujan</u>, 504 U.S. at 572–73 nn. 7–8; <u>Ashley Creek Phosphate Co. v. Norton</u>, 420 F.3d 934, 938 (9th Cir. 2005) ("[a] free-floating assertion of a procedural violation, without a concrete link to the interest protected by the procedural rules, does not constitute an injury in fact"). The desire to use or observe an animal species, even for aesthetic or recreational purposes, is a concrete

1    interest for purposes of standing.  See City of Sausalito v. O'Neill, 386 F.3d 1186, 1197 (9th Cir.

2    2004); Lujan, 504 U.S. at 562–563 (citing Sierra Club v. Morton, 405 U.S. 727, 734 (1972)).

3         The three individual plaintiffs in this case are Okinawan citizens who have made and will

4    continue to make ongoing trips to Henoko Bay to observe the dugong.  See, e.g., Higashionna Dec.

5    ¶¶ 1, 5.  These ongoing trips are concrete plans, not indefinite intentions to visit "some day" in the

6    future.  Cf. Lujan, 504 U.S. at 564.  Takuma Higashionna was born and raised near Henoko Bay and

7    has been visiting the area and observing the Okinawa dugong since his childhood.  Id. ¶ 3.  He leads

8    weekly snorkeling and scuba-diving tours to view dugongs and their habitat.  Id.  Yoshikazu

9    Makishi was also born and raised in Okinawa and has been frequenting the Henoko coast and

10   observing the Okinawa dugong for over a decade.  Makishi Dec. ¶ 2.  Anna Koshiishi moved to the

11   coast of Okinawa when she was eight years old and has lived there ever since.  Koshiishi Dec. ¶ 2.

12   Like Higashionna, she also leads eco-tours to view the dugong.  Id. ¶ 3.  As averred in their

13   affidavits, these plaintiffs have a concrete interest to preserve the dugong for cultural, educational,

14   aesthetic, inspirational and economic benefits to themselves and their descendants.  For example,

15   Higashionna states that the dugong has particular cultural and historic significance because it is part

16   of the creation beliefs of the Japanese and especially the people of Okinawa.  Higashionna Dec. ¶ 4.

17   He hopes to preserve the dugong so that it may enrich the lives of his descendants, as it has enriched

18   his own life.  Id.; see also Makishi Dec. ¶ 3, Koshiishi Dec. ¶ 5.

19        These concrete interests are directly linked to the procedural injury caused by defendants'

20   failure to comply with the NHPA because to the extent that compliance with the "take-into-account"

21   process leads to avoidance or mitigation of harm to the dugong, the very object of plaintiffs' interest

22   may be preserved and protected.  Morever, as required under the prudential standing requirements,

23   plaintiffs' interest in the preservation of dugong as historical and cultural property is precisely the

24   zone of interests protected by the NHPA.  In passing the NHPA, Congress declared that the purpose

25   of the statute was to preserve a nation's "irreplaceable heritage . . . so that its vital legacy of cultural,

26   educational, aesthetic, inspirational, economic, and energy benefits will be maintained and enriched

27   for future generations."  16 U.S.C. § 470(b)(4).  While this preservation interest arguably is shared

28

17

by the public at large, it is held with particular acuteness by plaintiffs in this case, long-time residents of Okinawa who benefit from the dugong in direct and palpable ways. Cf. Lujan, 504 U.S. at 573–574. The court concludes, therefore, that plaintiffs have alleged a sufficient injury in fact because they seek to "enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs." Id. at 572.

In cases involving procedural injuries, the person who has been afforded a procedural right to protect his concrete interests can assert that right without meeting the normal standards for redressability and causation. Nuclear Info., 457 F.3d at 950; Lujan, 504 U.S. at 573 n.7. Here, plaintiffs' showing of redressability and causation is not defeated by the fact that DOD's compliance with NHPA procedures would not necessarily prevent the construction of the military facility nor result in a change in its design, and that the actual construction of the facility is several years in the future. The NHPA itself does not require a particular outcome and it neither forbids destruction of a protected property nor commands its preservation[4]. Coliseum Square Ass'n, Inc. v. Jackson, 465 F.3d 215, 225 (5th Cir. 2006), cert. denied 128 S.Ct. 40. It simply regulates the process by which an undertaking is approved, requiring a federal agency to "stop, look, and listen." Id. The approval process must involve "informed decision-making" the aim of which is "to make government officials notice environmental [and other] considerations and take them into account." Nulankeyutmonen Nkihtaqmikon v. Impson, 503 F.3d 18, 28 (1st Cir. 2007). When an undertaking is approved without such informed consideration, the procedural injury alleged by plaintiffs has already occurred. Id. This is so even if informed consideration will not necessarily alter plans for the undertaking and even if the actual implementation of the undertaking is several years in the future.

Defendants assert that because the Government of Japan bears ultimate responsibility for selecting the site of the military facility and funding and carrying out its construction, plaintiffs cannot fairly trace their injuries to the activities of the defendants in order to show causation. As is apparent from the discussion above, however, DOD does not violate the NHPA by virtue of its bilateral participation in the design, site selection, construction and operation of a military facility

18

that threatens a protected property. The NHPA violation arises instead from DOD's failure to take into account information relevant for making a determination as to whether the military facility will adversely affect the dugong and if so, how those effects may be avoided or mitigated. In other words, the challenged activity is not the undertaking itself, but the process by which the effects of the undertaking are considered and assessed. As the court elaborates in Part III below, section 402 of the NHPA places the responsibility to consider and assess on the DOD and the DOD alone. Plaintiffs' injury, therefore, is directly traceable DOD, not the Government of Japan.

In sum, the three individual plaintiffs have suffered a procedural injury linked directly to plaintiffs' concrete interest in preserving the culturally and historically significant Okinawa dugong, an interest that is within the "zone of interests" protected by the NHPA. Plaintiffs' injury is caused by the failure of DOD to comply with procedures under NHPA section 402 and can be redressed by a favorable decision requiring DOD to so comply. The court concludes that the three individual plaintiffs have standing to assert this action.

3.    Associations

For an association to having standing to sue on behalf of its members, it must show that (1) its members would have standing to sue "in their own right"; (2) the interests at stake in the lawsuit are "germane to the organization's purpose"; and (3) neither the claim nor the relief sought requires members to participate individually in the litigation. Friends of the Earth v. Laidlaw, 528 U.S. 167, 181 (2000); Nuclear Info., 457 F.3d at 950. Plaintiffs, as required on a motion for summary judgment, have provided affidavits related to four of the six environmental associations—Save the Dugong Foundation, Center for Biological Diversity, Turtle Island Restoration Network, and Japan Environmental Lawyers Foundation. The two remaining two associations—Dugong Network Okinawa and Committee Against Heliport Construction/Save Life Society—have not submitted any evidence concerning their standing to sue and are dismissed accordingly.

Save the Dugong Foundation member Takuma Higashionna is an individual plaintiff, and the court has already determined that Higashionna has standing to sue in his own right. Center for Biological Diversity member Jeff Shaw lives in Okinawa, is married to an Okinawan family that

holds religious and spiritual beliefs based on the dugong, holds those same beliefs himself, has written articles and a book based on his research of the dugong, and is an avid scuba diver who has seen firsthand the seagrass beds on which the dugongs feed and hopes one day to view the dugong itself.  Shaw Dec. ¶¶ 1–4.  Both Turtle Island Restoration Network member and director Todd Steiner and Japan Environmental Lawyers Foundation member Masato Murata aver that they and their fellow members make regular trips to observe, study, photograph, and film the dugong.  Steiner Dec. ¶¶ 1–6; Murata Dec. ¶ 4.  Like Higashionna, Shaw, Steiner, and Murata each have standing to sue in their own right.  Moreover, the purpose of all four of these organizations is to preserve and protect the dugong through research, fund-raising and advocacy, and thus the interests at stake in the lawsuit are germane to the organizations' purposes.  Higashionna Dec. ¶ 2; Galvin Dec. ¶ 2; Steiner Dec. ¶ 2; Murata Dec. ¶ 2.  Lastly, because the claim and injunctive and declaratory relief sought do not require the individual participation of the members, the court finds that four of the six plaintiff organizations have standing to assert this action.

C.     Ripeness

Whereas standing asks "who" may bring a claim, ripeness asks "when" a claim may be brought.  Impson, 503 F.3d at 32.  With respect to administrative decisions, the ripeness doctrine seeks to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Laboratories, 387 U.S. at 148–149.  To determine whether a claim is ripe, a court "evaluate[s] both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Id. at 149.

Claims involving injury caused by a failure to comply with statutory procedure may be brought at the time the failure takes place, for the claim can never get riper.  Ohio Forestry Ass'n Inc. v. Sierra Club, 523 U.S. 726, 737 (1998).  In this case, plaintiffs allege that DOD has approved plans for construction of a military facility without having complied with procedures set forth in the

NHPA.  As the court explained in the preceding analysis of final agency action, the 2006 Roadmap is not an abstract proposal.  It sets forth detailed specifications regarding the location and configuration of the replacement military facility.  Two runways aligned in a V-shape will be built largely on landfill adjacent to the existing Camp Schwab, but will also extend more than a mile into the waters of Oura and Henoko Bays.  Moreover, where a statute, like the NHPA, "simply guarantees a particular procedure, not a particular result," a claim is ripe when the agency fails to comply with the procedure.  Ohio Forestry, 523 U.S. at 737 (claim alleging violations of the National Forest Management Act was not ripe for review at the time of agency's approval of logging plans because the statute, in guiding *use* of forests, was result driven, not procedure driven); see also Laub v. Dep't of Interior, 342 F.3d 1080, 1089–1090 (9th Cir. 2003) (recognizing the distinction between substantive challenges directed at a result and procedural challenges directed at a review and approval process).  Plaintiffs allege that DOD has failed to comply with statutory procedure required under the NHPA, and therefore "now is the appropriate time to complain that the agency failed to do its duty."  Impson, 503 F.3d at 32.  The court concludes that plaintiffs' claims are ripe for review.

DOD argues that the claim is not ripe because before construction of the military facility can begin, Japan must obtain local approval and must complete an environmental impact assessment as required under Japanese law.  Defendants in Impson asserted a similar argument.  There, plaintiffs challenged the failure of the Bureau of Indian Affairs ("BIA") to comply with the NHPA prior to approval of a lease of tribal land to a developer for construction of a liquified natural gas terminal.  Id. at 25.  The BIA argued that the claim was not ripe because implementation of the lease was contingent upon multiple factors, including review and authorization by the Federal Energy Regulatory Commission ("FERC").  Id. at 33.  As a coordinating agency, the BIA would participate in the FERC review process and would consider the impacts of the lease.  Id.  The court in Impson stated that defendants' points did not go to the issue of ripeness.  Id.  Instead, whether the BIA could fulfill its statutory obligations by participating in the FERC process was a question on the merits.  Id.  Likewise, whether DOD can fulfill its statutory obligations under the NHPA through Japan's

21

UNITED STATES DISTRICT COURT
For the Northern District of California

completion of an environmental review process is a question on the merits of plaintiffs' claims, not a question of ripeness.

D.    Act of State

The act of state doctrine is "not a jurisdictional limit on courts," but "reflects the prudential concern that the courts, if they question the validity of sovereign acts taken by foreign states, may be interfering with the conduct of American foreign policy by the Executive and Congress." Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 707 (9th Cir. 1992).  The doctrine bars judicial review of an action "only if: (1) there is an 'official act of a foreign sovereign performed within its own territory'; and (2) 'the relief sought or the defense interposed [in the action would require] a court in the United States to declare invalid the [foreign sovereign's] official act.'" Credit Suisse v. United States District Court, 130 F.3d 1342, 1346 (9th Cir. 1997).  Defendants argue that the court is asked to "adjudicate a claim that questions the validity of decisions and acts [made by Japanese] officials taken under Japanese law." Defs.' Mem. at 24.  They argue that the court should not "enjoin—even indirectly by an order directed only at the defendants—the [Government of Japan's] ability and sovereign right to site and construct the FRF in satisfaction of its military and security treaties with the United States," and to conduct an environmental assessment of the replacement facility as required under Japanese environmental laws.  Id. at 6.

Defendants asserted similar arguments in connection with their earlier motion in 2005.  In ruling on that 2005 motion, the court found that the record at that time "[did] not currently describe an 'official act of a foreign sovereign performed within its own territory,' but rather a process intertwined with United States Department of Defense decision-making." Dugong, 2005 WL 522106 at 20.  The court found that the planning process for the FRF  was "a cooperative and bilateral venture undertaken to satisfy American military needs." Id.  The court held that, at that time, defendants were not entitled to summary judgment on the basis of the act of state doctrine because "[w]here a court evaluates the actions of a federal agency, the act of state doctrine is not implicated." Id.  The court did note, however, that further discovery would assist in resolving then-existing "disputed issues of material fact on the question of whether the United States Department of

1  Defense instigated the Futenma relocation, established the requirements for fulfilling that relocation,

2  and continues to aid logistically, and potentially financially, in the implementation of the project."

3  Id. at 19.  The court contemplated that additional discovery might ultimately reveal that "the scope

4  of Japan's involvement in locating the replacement air station may prove to exceed the prudential

5  limitations on this court's authority under the act of state doctrine."  Id.

6       Since the court's 2005 order, defendants have compiled four separate administrative records,

7  each covering a different aspect of the planning effort for the replacement facility.  The facts in the

8  current record reinforce the court's earlier finding of a cooperative and bilateral process of

9  intertwined decision-making.  For example, the court acknowledges that Japan had ultimate

10 responsibility for selecting the location of the replacement facility, and that Japan's site selection

11 was driven by its own concerns for environmental, engineering, political and cost factors.  Lawless

12 Dec. ¶ 10.  Japan's responsibility for selecting the site, however, was also constrained by operational

13 requirements chosen and determined by the United States, and defendants' own evidence supports

14 the fact that Japan's decision to locate the proposed FRF was influenced by the DOD.  The

15 Government of Japan initially preferred a plan that utilized the land area of Camp Schwab, rather

16 than placing the facility into the waters of Henoko Bay.  But the facility was placed in its currently

17 proposed off-shore location because the United States preferred that location for operational reasons.

18 Moriya Dec. ¶ 8.  Ultimately, the United States could not accept any plan proposed by the Japanese

19 government unless the plan conformed to U.S. operational requirements.  Id. ¶ 10; Lawless Dec. ¶¶

20 10, 13.  As the court stated in its 2005 order, the activities involved in this case are not exclusively

21 those of foreign governmental bodies.  Rather, the United States has been substantially involved in

22 the design and site selection for the FRF, will continue to monitor and oversee the construction of

23 the facility to ensure that it meets U.S. requirements, and will have exclusive authority to operate the

24 facility once it is completed.

25      Japan's involvement in the FRF project does not by itself implicate the act of state doctrine.

26 The Supreme Court has stated that "[i]n every case in which we have held the act of state doctrine

27 applicable, the relief sought or the defense interposed would have required a court in the United

28

23

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

States to declare invalid the official act of a foreign sovereign performed within its own territory." W.S. Kirkpatrick & Co. v. Environmental Tectonics Co., Int'l, 493 U.S. 400, 405 (1990). While this case may involve various activities, some of which are the responsibility of Japan, e.g., siting and construction, and some of which are the responsibility of the United States, e.g., operational requirements, the only activities upon which the court sits in judgment are those obligations placed upon the United States under provisions of U.S. domestic law. The court's jurisdiction in this case is premised on the NHPA and the APA and therefore, the only activities which this court reviews are DOD's obligations related to the section 402 process of taking into account. As the court explains in Part III below, the obligation to take into account lies with the DOD and the DOD alone. Relief requiring the DOD to take into account, therefore, in no way invalidates Japan's decision to locate the FRF in the particular area and configuration it has chosen and in no way interferes with Japan's ability to conduct its own environmental assessment according to Japanese law. Again, the court reiterates that the NHPA compels a particular process, not a particular result. The NHPA requires and the court can only mandate that the DOD engage in an information gathering process which may eventually lead to such modifications and alterations if, as a result of the information gathering process, it is determined that those changes may mitigate adverse effects on protected property. Just as the court held in its 2005 order, the act of state doctrine is not implicated here because judicial review does not require the court to invalidate the sovereign acts of the Government of Japan. This court's review is directed solely at DOD's compliance with the NHPA.

Defendants raise additional concerns that merit discussion here. Defendants recognize that NEPA Coalition of Japan v. Aspin, 837 F.Supp. 466 (D.D.C. 1993), does not stand for the proposition that extraterritorial application of the NHPA is barred as a matter of law. Indeed, the court so ruled in 2005 when it held that section 402 of the NHPA contains express Congressional intent that the NHPA, unlike the National Environmental Protection Act at issue in NEPA Coalition, apply abroad. Defendants argue, however, that NEPA Coalition stands for "the broader proposition that a federal court should not apply a provision of United States environmental law in a manner that creates a 'substantial likelihood that treaty relations will be affected.'" Defs.' Mem. at 27.

24

Defendants argue further that

> Any ruling requiring the [U.S. Government] to take action with respect to the dugong that is inconsistent with or contrary to the considered judgment of the [Government of Japan] regarding how best to protect one of Japan's own cultural resources would undermine the carefully negotiated allocation of sovereign responsibilities agreed to by both nations in the Roadmap. . . . A court order requiring the DOD to take premature, inconsistent, or contrary action to that being taken by the [Government of Japan] . . . and compelling the DOD to conduct its own assessment of potential impacts on cultural resources, apart from Japan's ongoing effort, would frustrate Japan's exercise of its own legal procedures for protecting and managing the environment and its cultural resources.

Id. at 28. The court recognizes that these are valid and important concerns. But these concerns do not imply that the court must invoke the act of state doctrine and decline to rule on the merits of plaintiffs' NHPA claim. Rather, these concerns, as the court elaborates in Part III below, delineate and give contour to the meaning and scope of the substantive requirement to take into account. As the court explains below, the concerns articulated by the defendants are precisely the reasons why the take into account process encourages and indeed requires cooperation and coordination with other agencies and governments.


E.       Necessary and Indispensable Party

Defendants' final attempt to prevent the court from reaching the merits of this case rests on a failure to join the Government of Japan as a necessary and indispensable party under Rule 19 of the Federal Rules of Civil Procedure ("FRCP"). But as the court has already discussed above, relief requiring DOD to take into account under section 402 can be fashioned without directly or indirectly interfering with any decision by the Government of Japan. Thus, the court's review is not barred by virtue of FRCP Rule 19.


F.       Conclusion

Defendants have asserted and the court has addressed five separate bases for barring the court's review. The court holds that DOD's failure to take into account the effects of the Futenma Replacement Facility on the Okinawa dugong is agency action that is final in light of DOD's approval of the 2006 Roadmap and DOD's establishment of operational requirements. The Okinawa

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    dugong and two of the environmental associations (Dugong Network Okinawa and Committee

2    Against Heliport Construction/Save Life Society) do not have proper standing and are dismissed

3    accordingly.  The three individual Japanese citizens, as well as the four remaining associations,

4    however, do have proper standing to assert this action.  In addition, plaintiffs' claims are ripe, and

5    neither the act of state doctrine nor FRCP Rule 19 stand in the way of the court's review.  The court

6    will now proceed to address the substantive issues of whether the NHPA applies to the

7    circumstances of this case, and if so, whether DOD has met its obligation to take into account.

8

9    II.    Applicability of NHPA Section 402

10         As a threshold matter, a federal agency's obligation to take into account under section 402 is

11   triggered only when there is (1) a federal undertaking outside the United States (2) which may

12   directly and adversely affect (3) a property which is on the applicable country's equivalent of the

13   National Register.  16 U.S.C. § 470a-2.  The court, in its March 2005 order, previously addressed the

14   issue of whether the NHPA applies to the circumstances of this case.  In that order, the court held

15   that the Okinawa dugong is protected by Japan's Law for the Protection of Cultural Properties, the

16   equivalent of the United States National Register, and is "property" within the meaning of section

17   402.  Dugong, 2005 WL 522106 at 6–12.  The facts upon which that ruling was made remain the

18   same, and accordingly, the court reaffirms that the Okinawa dugong is protected property under the

19   NHPA.  Because the record was undeveloped at the time of the court's March 2005 order, the court

20   withheld judgment and ordered discovery on the two remaining issues of whether DOD's

21   involvement in the military facility could constitute a (1) "federal undertaking" that (2) "may

22   directly and adversely affect" the dugong.  Given the more fully developed record now available, the

23   court will proceed to address these two issues below, resolving both in favor of plaintiffs.

24

25         A.    "Undertaking"

26         Defendants concede that their involvement in the FRF including the provision of operational

27   requirements for the FRF and the approval of the 2006 Roadmap, constitutes a federal undertaking

28

within the meaning of section 402.  Defs.' Mem. at 30, n.18.  In its 2005 order, the court discussed at

length the statutory definition and meaning of an "undertaking."  Dugong, 2005 WL 522106 at

12–17.  It is therefore unnecessary to repeat that discussion here, but one point deserves mention.  In

its 2005 order, the court surmised that "Congress may have intended a less restrictive definition of

undertakings to apply to federal projects abroad."  Id. at 12.  In light of the legislative history,

however, it is clear that Congress intended the meaning of "undertaking" in section 402 to have the

same meaning as the same term used in section 106.  House Report No. 96–1457, Oct. 10, 1980,

U.S. Code Cong. and Adm. News, 6378, 6408 ("The Committee also notes that the term

'undertaking,' as it is used in other sections of the Act, is meant to be used in the same context as

described in Section 106.  The [ACHP] has adopted an acceptable definition within its regulations,

published as 36 CFR 800.").

In light of defendants' concession, the court will only briefly summarize plaintiffs' extensive

arguments and evidence in support of demonstrating a federal undertaking.  The project to design,

construct, relocate and operate the FRF is funded at least in part under the jurisdiction of the DOD,

is carried out by and on behalf of the DOD, and requires federal approval.  16 U.S.C. § 470w(7).

DOD has expended funds in the planning and design of the FRF and will bear the costs of relocating

to and operating the facility once it is constructed.  The FRF project is carried out by and on behalf

of DOD because although the Government of Japan bears the full cost of the FRF's actual

construction, the facility is being constructed for DOD's exclusive use, according to operational

requirements determined by the DOD.  Each phase of the FRF requires, and has in fact received,

federal approval.  The initial decision to relocate the Futenma air station required and received DOD

approval through the U.S. Secretary of Defense's role on the bilateral Security Consultative

Committee ("SCC").  At the intermediate phase, the establishment of operational requirements

received independent DOD approval.  Finally, the ultimate decision to design and build the FRF as a

partially sea-based facility adjacent to Camp Schwab, with two runways aligned in a V-shaped

pattern, also received DOD approval when the bilateral SCC approved the 2006 Roadmap.  As

planning and construction moves forward, additional DOD approvals, such as entry permits for

UNITED STATES DISTRICT COURT
For the Northern District of California

engineers to enter Camp Schwab to carry out technical surveys and to begin actual construction, will be required. The court concludes that there is no issue of material fact as to whether DOD activities related to the Futenma Replacement Facility constitute a "federal undertaking" under NHPA section 402.

B.    "May Directly and Adversely Affect"

The third and final issue related to the applicability of the NHPA to this case is whether defendants' undertaking "may directly and adversely affect" the dugong. The statute requires a threshold showing that the undertaking *may* have direct and adverse effects on the dugong, not that the undertaking necessarily *will* have effects. The term "adverse effect" is not defined in the statute, but regulations implementing section 106 domestic undertakings set forth a meaning of adverse effect that is instructive in this case. Under the domestic regulations, "an adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property. . . . Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." 36 C.F.R. § 800.5(a)(1). An example of an adverse effect includes "physical destruction of or damage to all or part of the property." 36 C.F.R. § 800.5(a)(2)(I).

It is undisputed that Henoko Bay is dugong habitat and that seagrass beds found in the Bay are dugong feeding grounds. Undisputed Facts ¶ 4. It is also undisputed that dugong have been observed to feed in and traverse Henoko Bay. Id. The record contains considerable disagreement among plaintiffs' and defendants' experts regarding the extent and degree to which the dugong would be adversely affected. Compare Hines Dec. with Noah and Frankel Decs. But this does not disturb the undisputed fact that Henoko Bay is dugong habitat and therefore, construction and operation of a military facility in and near the Bay could have *potential* adverse effects. These potential adverse effects include physical destruction of the Okinawa dugong resulting from contamination of seagrass feeding grounds and collisions with boats and vessels, as well as long-term immune and reproductive damage resulting from exposure to toxins and acoustic pollution.

That the *actual* consequences may be currently unknown is precisely the reason the NHPA requires defendants to gather, examine and assess information. Doing so allows the agency to determine, early in the process of an undertaking, whether potential consequences may crystalize into actual effects and whether the actual effects will exceed a de minimis threshold. Because it is undisputed that Henoko Bay is a dugong habitat, the court finds that there is no material issue of fact as to whether the FRF may directly and adversely affect the dugong.

III.   "Take Into Account"

Having concluded that the court's review is proper and that the NHPA is applicable to the facts of this case, the court now turns to the merits of plaintiffs' claim that DOD has violated the NHPA by failing to "take into account" the effect of their undertaking on the Okinawa dugong. In its March 2005 order, the court reserved judgment on this issue until the record was more fully developed, as it is now. First, the parties dispute the meaning of "take into account" as a matter of law. Second, the parties dispute whether defendants' activities are sufficient to comply with the appropriate meaning of "take into account." The court will address each of these issues in turn.

A.   Meaning of "Take Into Account"

The meaning of "take into account" under section 402 governing foreign undertakings is an issue of first impression for the courts. The statute does not define the phrase "take into account," there are no regulations that directly define or elaborate the phrase, and neither the parties nor the court are aware of any case law construing the phrase. Defendants argue that in the absence of specific standards, criteria, or procedures, Congress delegated to the head of each federal agency the decision regarding how to comply with the "take into account" language of section 402. They argue that because the statute is silent or ambiguous with respect to the meaning of "take into account," the issue for the court is whether DOD's own interpretation of the statute—embodied in a series of internal directives and standards—is a permissible construction. Plaintiffs argue that the statute is not silent or ambiguous and that alternatively, DOD's interpretation of the statue is not a permissible

construction.

"When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue." Chevron v. Natural Resources Defense Council, 467 U.S. 837, 842 (1984). "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect" by both the court and the agency. Id. at 842–843, n.9. If, however, the statute is silent or ambiguous, "the court does not simply impose its own construction of the statute." Id. at 843. Rather, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. "The precise degree of deference warranted depends on the statute and agency action at issue." Northwest Ecosystem Alliance v. United States Fish and Wildlife Service, 475 F.3d 1136, 1141 (9th Cir. 2007). "Under Chevron's classic formulation, if . . . there is an express delegation of authority [by Congress] to the agency to elucidate a specific provision of the statute by regulation, [then] [s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Id. "If Chevron deference is inapplicable because Congress has not delegated interpretative authority to the agency, the agency's views still 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" Id. "The 'fair measure of deference' may then range from 'great respect' to 'near indifference,' depending on 'the degree of the agency's care, its consistency, formality and relative expertness, and . . . the persuasiveness of the agency's position.'" Id.

Under Chevron step one, this court must determine, based on the statute's language, legislative history, structure and purpose, whether there is clear Congressional intent regarding the meaning of the phrase "take into account." On its face, the phrase "take into account" means consider, contemplate, study, and weigh. Webster's Int'l Dictionary of the English Language (3rd ed. 1976) (defining the phrase "take into account" to be synonymous with "take into consideration," and in turn, defining "consider" to be synonymous with "contemplate," "study," and "weigh"). This plain meaning of "take into account" is consistent with the purposes of the NHPA to "generat[e]

information about the impact of federal actions on the environment," and to "require[] . . . the relevant federal agency [to] *carefully consider* the information produced," <u>San Carlos Apache Tribe v. United States</u>, 417 F.3d 1091, 1097 (9th Cir. 2005) (emphasis added), and to "*weigh* effects in deciding whether to authorize" a federal undertaking, <u>Save Our Heritage v. Fed. Aviation Admin.</u>, 269 F.3d 49, 58 (1st Cir. 2001) (emphasis added). The statutory text also contains requirements relating to *who*, *when*, and *what* shall be taken into account, as well as *why* an accounting is necessary. The statute states that (1) "the head of a Federal agency having direct or indirect jurisdiction over such undertaking" shall be the person charged with the task of taking into account, (2) the accounting shall occur "prior to approval" of the undertaking, and (3) the accounting shall consider the "effects of the undertaking" on the protected property. 16 U.S.C. § 470a-2. Finally, the statute is clear regarding why the taking-into-account is required. It is conducted "for purposes of avoiding or mitigating any adverse effects." <u>Id.</u>

Although not evident from the plain language of section 402, related sections of the NHPA indicate clear Congressional intent that the take into account process involves not a federal agency acting alone, but instead, an agency acting in cooperation with relevant nations, parties, and organizations. When it enacted section 402 in 1980, Congress declared that "[i]t shall be the policy of the Federal Government, *in cooperation with other nations* and *in partnership with* the States, local governments, and Indian tribes, and *private organizations and individuals*" to "provide leadership in the preservation of the . . . resources of the United States and the international community of nations." 16 U.S.C. § 470-1(2) (emphasis added); Pub. L. 95–515 § 101(a), Sec. 2. Similar Congressional intent is expressed in the legislative history of the 1980 amendments. The House Report states that the purpose of the World Heritage Convention—which section 402 implements for the United States—"is to establish an effective system of *collective* protection of the cultural and natural heritage." House Report No. 96–1457, Oct. 10, 1980, U.S. Code Cong. and Adm. News 6378, 6406. Section 402, therefore, should be read in conjunction with Congress' declaration of policy requiring cooperation, partnership, and collective participation.

The plain language of section 402, combined with express legislative purpose, reveals clear

1   Congressional intent regarding the basic components of a take into account process under section

2   402.  The process, at a minimum, must include (1) identification of protected property, (2)

3   generation, collection, consideration, and weighing of information pertaining to how the undertaking

4   will affect the historic property, (3) a determination as to whether there will be adverse effects or no

5   adverse effects, and (4) if necessary, development and evaluation of alternatives or modifications to

6   the undertaking that could avoid or mitigate the adverse effects.  The person charged with

7   responsibility for this basic process is the person with jurisdiction over the undertaking, and

8   compliance with the process must occur before the undertaking is approved.  In addition, a federal

9   agency does not complete the take into account process on its own, in isolation, but engages the host

10  nation and other relevant private organizations and individuals in a cooperative partnership.

11         That Congress clearly intended a take into account process to include these basic components

12  is further supported by the context in which section 402 was enacted.  In 1980 when Congress

13  amended the NHPA to add section 402 governing foreign undertakings, the same "take into account"

14  phrase had been used fourteen years earlier when Congress enacted section 106 governing domestic

15  undertakings.  16 U.S.C. § 470f.  Moreover, by the time Congress added section 402, the ACHP had

16  already promulgated regulations elaborating what it means to take into account for purposes of

17  section 106 domestic undertakings.  36 C.F.R. Part 800.  Although the ACHP has from time to time

18  amended the section 106 regulations, the essential elements—identification of protected properties,

19  gathering and weighing of information, determination of adverse effect or no adverse effect,

20  evaluation of mitigation measures if necessary, and consultation with interested parties and

21  organizations—were in place by 1980[5].  When identical words are used in different parts of the same

22  act, the natural presumption is that Congress intended them to have the same meaning.

23  Environmental Defense v. Duke Energy Corp., 127 S.Ct. 1423, 1432 (2007).  Moreover, "Congress'

24  repetition of a well-established term carries the implication that Congress intended the term to be

25  construed in accordance with pre-existing regulatory interpretations."  Bragdon v. Abbott, 524 U.S.

26  624, 631 (1998).  Here, the basic framework for a take into account process was well-understood at

27

28

the time Congress used the identical phrase in section 402. This raises an inference that Congress intended the take into account process under section 402 to follow the basic structure the ACHP had already outlined for undertakings governed by section 106.

The court does not suggest, and plaintiffs do not argue, that the ACHP's regulations in 36 C.F.R. Part 800 apply verbatim to section 402 undertakings. It is clear that the section 106 process does not map directly onto the section 402 process. Congress did not include a statutory provision expressly incorporating into section 402 the ACHP's existing regulations. Cf. Bragdon, 524 U.S. at 631. Moreover, the statutory text of section 106, unlike that of section 402, expressly requires a federal agency to consult with the ACHP, 16 U.S.C. § 470f (a federal agency "shall afford the [ACHP] . . . a reasonable opportunity to comment"), and while the ACHP is given express authority to promulgate regulations implementing section 106, it does not have comparable authority for section 402, see 16 U.S.C. § 470s. The differing role of the ACHP in the domestic and foreign contexts, however, does not rebut the natural presumption that Congress intended the "take into account" phrase in section 402 to follow the basic outline of section 106 set forth by the ACHP. Granted, "[a] term in the same statute may take on distinct characters from association with distinct statutory objects calling for different implementation strategies." Environmental Defense, 127 S.Ct. at 1432. But while Congress may have been silent on the regulatory specifics and implementation details, allowing the precise letter of the statute to be filled in by a particular agency depending on the agency's mission and undertaking, Congress was clear on the basic spirit and framework of the take into account process. There is no reason to believe that Congress intended the basic framework to differ depending on the geographic location of the undertaking and the protected property.

Congress' intent that the basic framework of the take into account process remain cohesive across a multitude of agencies and undertakings is reflected in the fact that Congress provided for a mechanism to achieve that cohesiveness. NHPA section 110 directs each federal agency to develop a preservation program. 16 U.S.C. § 470h-2(a)(2). An agency's preservation program "shall ensure" that properties are considered and taken into account during both foreign and domestic undertakings pursuant to section 402 and section 106, respectively. Id. § 470h-2(a)(2)(C) (requiring

an agency's preservation program to consider the preservation of properties in general, whether or not they are under the jurisdiction or control of the agency, and whether or not they are affected by foreign or domestic agency actions); id. § 470h-2(a)(2)(E) (requiring an agency's preservation program to include procedures for compliance with section 106 domestic undertakings). Significantly, NHPA section 110 directs that "[e]ach Federal agency shall establish . . . , *in consultation with the Secretary [of the Interior]*, a preservation program." Id. § 470h-2(a)(2) (emphasis added). In addition, an agency's procedures for complying with section 106 domestic undertakings must be consistent with the regulations issued by the ACHP. Id. § 470h-2(a)(2)(E)(I). In the domestic context, therefore, Congress provided for coherency in agency preservation programs by requiring consultation with the Secretary of the Interior, and by specifically mandating consistency with the ACHP's section 106 regulations. In the foreign context, Congress also provided for coherency in agency preservation programs by requiring consultation with the Secretary of the Interior. Although there is no express mandate that an agency's take into account procedures for foreign undertakings be consistent with the ACHP's domestic regulations, there is no indication that Congress intended the basic framework of foreign and domestic take into account procedures to differ.

In developing a preservation program as required under section 110, a federal agency consults with the Secretary of the Interior, and accordingly, Congress has delegated to the Secretary authority to promulgate guidance to assist agencies in fulfilling their responsibilities. Id. § 470a(g). Under this authority, the Secretary of the Interior, acting through the National Park Service, has indeed issued such guidance, which "have no regulatory effect," but nevertheless are "the Secretary's formal guidance." 63 Fed. Reg. 20496–20508, 20496 (April 24, 1998). With respect to foreign undertakings under section 402, the guidelines recommend that "[e]fforts to identify and consider effects on historic properties in other countries should be carried out in consultation with the host country's historic preservation authorities, with affected communities and groups, and with relevant professional organizations." 63 Fed. Reg. at 20504 (Standard 4, Guideline (o)). The guidelines advise that such consultation should involve a "process of seeking, discussing and

34

**UNITED STATES DISTRICT COURT**
For the Northern District of California

considering the views of others, and where feasible, seeking agreement with them on how historic properties should be identified, considered, and managed." Id. (Standard 5, Guideline (a)). "While specific consultation requirements and procedures will vary among agencies depending on their missions and programs, the nature of historic properties that might be affected, and other factors, consultation should always include all affected parties." Id. (Standard 5, Guideline (d)). The guidelines also advise that consultation should occur "early in the planning stage of any Federal action that might affect historic properties." Id. (Standard 5, Guideline (c)).

As the Secretary of the Interior recognizes, "specific consultation requirements and procedures will vary among agencies depending on their missions and programs," and therefore, an agency has some discretion in deciding exactly who will be consulted, to what extent, and at precisely what time. Likewise, an agency has some discretion to decide exactly what information regarding effects of the undertaking it will generate, gather, and consider, and if adverse effects are found, exactly what mitigation efforts it will evaluate and pursue. Under <u>Chevron</u> step two, an agency's specific formulation of the take into account process is entitled to deference from a court. Nevertheless, under <u>Chevron</u> step one, Congress' intent that the section 402 take into account process contain basic elements—identification of protected properties, gathering and weighing of information, determination of adverse effect or no adverse effect, evaluation of mitigation measures if necessary, and consultation with interested parties and organizations—is evident. Congress explicitly declared that preservation of historic properties would be carried out in cooperation and in partnership with other nations, private organizations, and individuals. 16 U.S.C. § 470-1. Congress enacted section 402 using the same take into account phrase used previously when Congress enacted section 106, and at the time, the ACHP had already promulgated regulations setting forth a basic framework for the section 106 take into account process. 36 C.F.R. Part 800. Congress provided a mechanism, through the formal guidance of the Secretary of the Interior, to achieve coherency and consistency across the various preservation programs of different agencies. 16 U.S.C. § 470a(g). It is implausible, therefore, that Congress intended the essential elements of a take into account process—whether conducted in the context of a foreign or domestic undertaking—to differ widely.

1   Finally, the fact that the Secretary of the Interior's guidance for section 402 undertakings is

2   consistent with the basic framework for section 106 undertakings supports the notion that the basic

3   framework is evident from express Congressional policy and the NHPA's text, purpose, structure,

4   and history.

5

6          B.      Compliance With "Take Into Account"

7          Defendants assert that information about the Okinawa dugong was taken into account during

8   bilateral discussions to select the site for the FRF, and will continue to be taken into account as

9   Japan moves forward with its own environmental review process.  Defendants provide the

10  declaration of Takemasa Moriya, the Japanese Administrative Vice Minister for Defense, who states

11  that potential impacts on the dugong and its feeding grounds were of utmost importance to him and

12  the Japanese government in selecting the site and configuration of the FRF.  Moriya Dec. ¶¶ 8, 11.

13  Because of concern for the dugong, the Japanese initially proposed a facility built completely on

14  land, but this option was not possible due to U.S. operational requirements.  Id. ¶ 8.  Rather than

15  shift the facility further into the shallow waters as the U.S. initially preferred, the Government of

16  Japan developed a plan in such a way that the construction of the new facility would avoid shallow

17  water areas to the extent possible, thereby limiting the potential impact on dugong feeding grounds.

18  Id.

19         Defendants also assert that the Government of Japan will continue to "give careful

20  consideration to impacts on the Okinawa dugong . . . as [Japan] proceeds with its environmental

21  review" process required under Japanese law.  Defs.' Mem. at 43.  Moriya explains that the Japanese

22  environmental assessment will include specific methods for surveying, predicting and assessing the

23  impacts of the FRF on the dugong.  Moriya Dec. ¶ 14.  He explains further that the initial scoping

24  document as well as the final results of the review will be subject to public comments, and such

25  comments will be considered by Japanese officials as they prepare an environmental impact

26  statement.  Id. ¶¶ 14–16.  Based on the results of the review process, Moriya explains that the

27  Government of Japan, in consultation with the United States, will take appropriate mitigation

28

36

measures, "taking comprehensively into account various factors including the opinions of the local communities, the need to meet the operational requirements of the U.S. forces, and the need to give due consideration to the natural environment." Id. ¶ 18.

Plaintiffs do not dispute and the court does not take issue with what Japan has or has not done with respect to the environmental assessment required under Japanese law. Indeed, as the court has already explained in connection with the act of state doctrine, the court's review is not directed at whether Japan has complied with Japanese law, but whether DOD has complied with its obligations under the NHPA. Section 402 of the NHPA is clear on its face—it assigns the obligation to take into account to "the head of a Federal agency having direct or indirect jurisdiction over such undertaking." 16 U.S.C. § 470a-2. It is undisputed that, in this case, the Secretary of the Department of Defense has direct jurisdiction over the FRF project. The obligation to take into account, therefore, lies with the DOD and the DOD alone. While defendants insist that impacts on the dugong were taken into account, the court must ask not only *whether* the effects were taken into account, but *by whom*—the Department of Defense? The fact that Japan will conduct an environmental assessment pursuant to Japanese law does not relieve DOD of its independent obligation to take into account under the NHPA.

The current record contains no evidence that a single official from the DOD with responsibility for the FRF has considered or assessed the available information on the dugong or the effects of the FRF. For example, defendants provide the declaration of Richard Lawless who is the DOD official responsible for bilateral negotiations concerning the FRF and who reports to the Secretary of Defense. Lawless Dec. ¶ 1. His declaration, while noting that the Government of Japan placed particular emphasis on preserving seagrass beds and avoiding adverse impacts to the dugong, is silent as to whether DOD also took similar concerns into account. See, e.g., id. ¶¶ 11–12. Indeed, Lawless' declaration indicates that DOD's overarching, and perhaps only concern, was that the FRF comply with U.S. operational and safety requirements. See, e.g., id. ¶¶ 10, 13. Additional evidence in the record supports this view. An October 2005 document summarizing the U.S.-Japan negotiations states, "[t]he U.S. side continued to maintain that while environmental impacts were

important, any FRF proposal must meet operational and safety requirements."  Shockey Dec., Exh. 5 at 5, Futenma Replacement Site Survey.  The document continues, **"the environmental issues are primarily a question of political will since any option will affect the environment and opponents will use environment-based arguments to advance their cause."**  Id. (emphasis added).  Insofar as these statements suggest that DOD need not concern itself with environmental impacts because they are unavoidable and are simply an expedient used by opponents to obstruct the FRF, these statements evince at best, plain ignorance of, and at worst, complete defiance of DOD's obligation to consider the impacts of the FRF on the dugong.  The court is unconvinced that DOD has expressed concern for, let alone taken steps to consider the effects of the FRF on the dugong.  As plaintiffs argue, "[i]t is disingenuous for DOD to now claim Japan's environmental concerns as their own."  Pls.' Reply at 24.

To be sure, the fact that DOD, not the Government of Japan, has the obligation to take into account under section 402 does not preclude DOD from considering information generated by Japan and coordinating with Japan to gather and compile relevant information.  Indeed, as the court has already discussed, Congress' intent that a basic review process involve coordination and consultation with the host nation, interested parties, and other organizations is evident from the language, purpose and structure of the statute.  Moreover, as the court alluded to when discussing the act of state doctrine, DOD need not take action that is inconsistent with or contrary to the actions of Japan.  This is especially true given that, as defendants observe, the Okinawa dugong is Japan's cultural and historical property and therefore, Japan's judgment regarding how best to protect that property should be of great concern to the DOD.  Duplicative, inconsistent efforts are not required.  To the contrary, coordination and consultation are required in order to avoid such wasted efforts.  Ultimately, however, the NHPA imposes on the DOD a responsibility to consider and weigh.  DOD must determine whether the available information is sufficient, and if not, what additional information must be gathered or produced.  DOD must examine that information, whether it is generated by the Government of Japan, by the DOD itself, or by outside experts and organizations.  Based on that information, DOD must determine whether there will be adverse effects or no adverse

effects. If there are adverse effects, DOD must consider and evaluate options to mitigate or avoid

those effects. Each of these steps can be accomplished with input and cooperation from the

Government of Japan and other parties, but ultimately, the responsibility rests with the DOD.

Defendants have directed the court's attention to a variety of documents and studies

purportedly showing a comprehensive analysis of all relevant considerations relating to potential

dugong impacts associated with the FRF. These documents include:

> (1)  the declaration of Stephen Getlein, the Natural Resources Manager for Marine Corps Base Camp Butler ("MCB Butler") which encompasses several facilities on Okinawa including Camp Schwab, Shockey Dec., Exh. 41;
>
> (2)  the initial and reply declarations of Michael Noah, who from October 2004 through April 2007, was the DOD Chief Supervisory Biologist stationed in Okinawa;
>
> (3)  the initial and reply declarations of Adam Frankel, a private expert consultant from the firm Marine Acoustics, Inc.;
>
> (4)  a December 2005 report prepared for the Department of the Navy by the consulting firm Geo-Marine, Inc., Shockey Dec., Exh. 9 (hereinafter "December 2005 Report"); and
>
> (5)  a June 2003 report conducted by the Facilities Engineer Environmental Affairs Branch of MCB Butler, Shockey Dec., Exh. 6 (hereinafter "June 2003 Report").

For a variety of reasons discussed below, these documents, contrary to defendants' assertion, are

inadequate to demonstrate defendants' compliance with NHPA section 402.

Stephen Getlein attests that "there are viable seagrass areas in Henoko Bay that could be

potential dugong feeding areas," but that "in [his] professional and personal opinion, . . . Henoko

Bay is not attractive habitat for dugongs, . . . and there are several areas around Okinawa Island

where the Okinawa dugong is more likely to feed than Henoko Bay." Getlein Dec. ¶¶ 8–9. The

same Getlein declaration was provided to the court when the court issued its prior order in 2005. In

that order, the court stated that "whether the bay provides active habitat for the species . . . is

certainly a key issue for pursuit during discovery and future dispositive motions." Dugong, 2005

WL 522106 at 18. Insofar as defendants re-submit Getlein's declaration to support the proposition

that the FRF will have minimal or no adverse effects on the dugong because Henoko Bay is not an

1   attractive habitat relative to other locations, this conclusion is disputed by other evidence in the

2   record.  First, the conclusion is belied by the Government of Japan having placed particular

3   emphasis on avoiding damage to seagrass beds in Henoko Bay.  See Moriya Dec.  Second,

4   defendants' own declarant Michael Noah attests that any relative comparison of the suitability of

5   Henoko Bay with alternative feeding locations around Okinawa Island lacks scientific foundation.

6   Noah Reply Dec. ¶¶ 10–13.  Noah explains that this is because Henoko Bay has been the focus of

7   most dugong and seagrass surveys, at the exclusion of other locations.  Id.  Therefore, there is

8   currently insufficient information to conclude that, relative to other locations, the quantity and

9   quality of seagrass found within the footprint of the FRF is either attractive or unattractive.  In any

10  event, the NHPA does not limit defendants' obligation to take into account to only those areas

11  deemed to be the most attractive, important, or significant.  Even if there exist habitats in other parts

12  of Okinawa Island that are more desirable than Henoko Bay, it is undisputed that Henoko Bay is

13  dugong habitat and therefore, the obligation to take into account has attached.  Undisputed Facts ¶ 4.

14

15      Defendants "urge the court to examine with great care the detailed and comprehensive

16  declaration provided by [Michael] Noah," and the court has done so.  Defs.' Mem. at 41.  Like

17  Getlein's declaration, Noah's declaration also recognizes that viable seagrass areas exist in Henoko

18  Bay, but suggests that the area is not a "preferred" or "high quality" dugong habitat.  Id. at 41, 42;

19  Noah Initial Dec. ¶ 51.  As already discussed, Noah himself admits that there is currently insufficient

20  evidence to evaluate the importance of Henoko Bay relative to other dugong habitats.  Noah also

21  observes that dugong populations are susceptible to harm from a variety of environmental stressors

22  including urban development, agricultural run-off, and commercial fishing ports.  Noah Initial Dec.

23  ¶¶ 55–63.  The presence of other sources of strain on dugong populations, however, does not change

24  the fact that construction and operation of the FRF may pose a separate and additional threat which

25  under the NHPA must be studied and evaluated.  Finally, Noah also discusses potential mitigation

26  measures involving the creation of new seagrass beds through transplantation of existing beds to

27  areas where seagrass has not become well established.  Id. ¶ 64.  He notes that the Government of

28

Japan "will make decisions on, and develop required mitigation for, any significant adverse impacts identified within the sovereignty of Japan." Id. ¶ 65. As the court has already discussed, however, NHPA section 402 is clear on its face—it imposes an obligation on DOD to consider information "for purposes of avoiding or mitigating adverse effects." 16 U.S.C. § 470a-2. While DOD may work in conjunction with Japan to evaluate mitigation measures, the NHPA imposes a responsibility on the DOD, not the Government of Japan.

The "bottom line" of Adam Frankel's declaration is that currently there is not enough information to "make meaningful predictions about how much or how little dugongs will be affected by the operations of the FRF." Frankel Reply Dec. ¶ 10. Frankel avers, "[t]he extent and duration of potential noise disturbance from aircraft would require quantification to determine any potential adverse effect [on the dugong]; without such quantification, little can be accurately stated about the level or effect of transmitted aircraft noise." Frankel Initial Dec. ¶ 33. Similarly, with respect to noise disturbance from boats, Frankel advises that "the number of boats resulting from the proposed airport facility should be quantified before the suggestion of possible impacts to dugong behavior, metabolic systems, and survivorship can be analyzed and discussed." Id. ¶ 27. Defendants suggest that it is plaintiffs' burden to provide the necessary quantification, Defs.' Mem. at 41, when in fact, the NHPA places this burden on defendants.

Finally, the December 2005 and June 2003 Reports, like the declarations of Getlein, Noah and Frankel, are also insufficient to demonstrate defendants' compliance with NHPA section 402. The court notes that both reports incorporate input and information generated by interested parties such as regional experts, academic and research institutions, U.S. and international agencies, and non-governmental organizations. See December 2005 Report at 1-10:1-11 ("a multitude of individuals, agencies, and databases were consulted during the search for data and information on the occurrence of marine resources" in Okinawa); June 2003 Report at 2 (seagrass identification aided by personnel from Okinawa Seagrass Watch). Such consultation and cooperation from interested parties is encouraged and required as a basic element of the section 402 take into account process. The December 2005 Report, however, is limited to an inventory and basic scientific

description of the dugong and seagrass.  See December 2005 Report at 2-33:2-34, 3-32:3-34.  The report mentions that a seagrass-watch program, initiated in Okinawa in 2002, was tasked with addressing the impacts of the FRF construction on seagrass beds and dugongs, but does not provide any further information on what conclusions were reached or whether the results of the program were considered by the DOD.  Id. at 2-34.  It appears that the seagrass-watch program identified seven species of seagrass within Henoko Bay, but stopped short of analyzing how the seagrass will be impacted by the FRF.  Id.  The June 2003 Report is also insufficient to satisfy DOD's obligations under section 402 because it is limited to assessing the effects of current Marine training activities and does not assess the effects of future construction and operation of the FRF.  See also Shockey Dec., Exh. 7, February 2005 Marine Corps Briefing (describing the June 2003 Report as an assessment of the effects of current U.S. Marine Corps training on habitats).

In sum, the current record reflects a failure by the DOD to comply with NHPA section 402.  This failure constitutes agency action that is unreasonably delayed and unlawfully withheld as provided by the APA.  Defendants have failed to produce, gather and consider information necessary for taking into account the effects of the FRF on the Okinawa dugong and for determining whether mitigation or avoidance measures are necessary and possible.  The current record contains an abundance of basic scientific knowledge regarding dugong behavior, migratory movements, feeding patterns, and seagrass habitats.  But this information alone is insufficient because the statute is clear—the information considered must bear on the "effects of the undertaking" on the protected property, and the information must be considered for the purpose of "mitigating or avoiding any adverse effects."  16 U.S.C. § 470a-2.  Defendants' own declarants admit that there is insufficient evidence to evaluate the effects of the undertaking, a necessary predicate for determining whether mitigation is necessary and possible.  If further information is needed in order to evaluate whether adverse impacts to the dugong will be minimal because Henoko Bay is a marginal habitat relative to other habitats around Okinawa Island, then DOD has a responsibility to ensure that such studies are conducted.  If more information is needed in order to evaluate whether noise disturbance from air and water vessels during construction and subsequent operation of the FRF will adversely impact the

dugong, then DOD has a responsibility to ensure that those studies are also conducted. Contrary to Noah's understanding, DOD, not the Government of Japan, has the obligation to evaluate mitigation measures if it is determined that there are adverse effects, but such evaluation can occur parallel to and in conjunction with Japan's own efforts.

The court is troubled that the 2006 Roadmap embodying final plans for the construction of the FRF has received the highest levels of approvals from the U.S. Secretaries of Defense and State. Yet, the impacts of the FRF on the dugong are currently not well-understood, and other than Noah's suggestion that seagrass beds might be transplanted to other locations, few mitigation measures have been studied and evaluated by the DOD. Defendants argue that insofar as the currently available information is insufficient or incomplete, any deficiencies will be addressed by Japan as it conducts a three-year environmental impact assessment pursuant to Japanese law. There is no doubt that, in satisfying its own obligations under the NHPA, defendants may consider the information generated by Japan's assessment. The critical question, however, is one of timing. It is true that, as the court stated in its 2005 order, construction of the facility has not yet begun, and the take into account process required by the NHPA can still occur. Dugong, 2005 WL 522106 at 15. Yet, it is also true that, as the court has consistently held, the statutory text requires defendants to take into account "*prior to approval* of an undertaking." 16 U.S.C. § 470a-2. Congress' express inclusion of a time frame indicates that Congress intended the take into account process to occur early in the planning stages of a federal undertaking when there is still a meaningful opportunity to consider adverse impacts and mitigation measures. Satisfaction of defendants' obligations under section 402, therefore, cannot be postponed until the eve of construction when defendants have made irreversible commitments making additional review futile or consideration of alternatives impossible.

Japan's environmental assessment has already begun and now is the time for DOD to actively participate and coordinate with Japan. Will Japan's assessment be sufficient for meeting DOD's obligations under section 402? If not, then how should Japan's assessment be supplemented? If supplemental information is necessary, then from what sources will the information be derived? These questions remain unanswered. If defendants wait to address these

issues until the end of the three-year period when the Japanese environmental assessment is complete and when Japan is ready to move forward under the terms of the Roadmap, it will be too late.

44

CONCLUSION

Plaintiffs' motion for summary judgment is GRANTED. Defendants' motion for summary judgment is DENIED. It is hereby ADJUDGED and ORDERED that:

1. Defendants have failed to comply with the requirements of NHPA section 402, 16 U.S.C. § 470a-2, and this failure to comply is agency action that is unreasonably delayed and unlawfully withheld, 5 U.S.C. § 706(1).

2. Defendants are ordered to comply with NHPA section 402, and this case is held in abeyance until the information necessary for evaluating the effects of the FRF on the dugong is generated, and until defendants take the information into account for the purpose of avoiding or mitigating adverse effects to the dugong.

3. Defendants are ordered, within ninety (90) days of the date of this order, to submit to the court documentation describing what additional information is necessary to evaluate the impacts of the FRF on the dugong; from what sources, including relevant individuals, organizations, and government agencies, the information will be derived; what is currently known or anticipated regarding the nature and scope of Japan's environmental assessment and whether that assessment will be sufficient for meeting defendants' obligations under the NHPA; and identifying the DOD official or officials with authorization and responsibility for reviewing and considering the information for purposes of mitigation.

4. If plaintiffs desire to respond to this submission, they shall file their response within forty-five (45) days of defendants' filing.

Dated: January 23, 2008

_____
MARILYN HALL PATEL
United States District Court Judge
Northern District of California

1. The full text of section 106 is as follows: "The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Counsel on Historic Preservation established under part B of this subchapter a reasonable opportunity to comment with regard to such undertaking." 16 U.S.C. § 470f.

2. Plaintiffs have moved to strike defendants' final-agency-action argument because defendants first raised it in their reply brief, and it is well-established law that arguments not made in an opening brief are deemed waived. United States v. Romm, 455 F.3d 990, 997 (9th Cir. 2006). Defendants oppose plaintiffs' motion to strike, arguing that the final-agency-action argument was directly raised in their opening brief at footnote 18 and was indirectly referred to in various other places. The court notes that burying in a footnote an argument that was eventually fleshed out to over two pages in the reply brief does not give the opposing party fair and sufficient notice. The court's subject matter jurisdiction, nevertheless, is limited to final agency actions under the APA and therefore, the court is required as a matter of law to examine whether its review is proper. The court denies plaintiffs' motion to strike defendants' argument and will consider all supplemental briefing filed by the parties in connection with this issue.

3. Plaintiffs characterize DOD's failure to take into account not only as agency action "unlawfully withheld" and "unreasonably delayed" under 5 U.S.C. section 706(1), but also as agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. section 706(2)(A). Second Amended Complaint, Prayer For Relief, ¶¶ 2–4. The court, however, notes that the failure to take into account is more appropriately brought under section 706(1), rather than section 706(2)(A).

4. An exception exists when a project affects a National Historic Landmark. In that case, an agency has an affirmative duty, "to the maximum extent possible, [to] undertake such planning and actions as may be necessary to minimize harm to such landmark." 16 U.S.C. § 470h-2(f); see also 36 C.F.R. § 800.10; Coliseum Square, 465 F.3d at 225, 243.

5. See generally 36 C.F.R. Part 800, revised as of July 1, 1980. Pertinent sections of the 1980 regulations are as follows: § 800.4(a) (identification of protected properties); § 800.4 (gathering and weighing of information); § 800.4(b), (c) (determination of adverse effect or no adverse effect); § 800.6(b)(4), (5) (evaluation of mitigation measures if necessary); § 800.6(b) (consultation with interested parties and organizations).