**United States District Court**
For the Northern District of California

1

2

3

4

5              UNITED STATES DISTRICT COURT

6              NORTHERN DISTRICT OF CALIFORNIA

7

8    CENTER FOR BIOLOGICAL DIVERSITY,          No. C-03-4350 EMC
     *et al.*,
9
                 Plaintiffs,                    **ORDER GRANTING DEFENDANTS'
10                                              MOTION TO DISMISS**
            v.
11                                              **(Docket No. 163)**
     CHUCK HAGEL, *et al.*,
12
                 Defendants.
13   _____/

14

15

16          Plaintiffs are three Japanese individuals and four environmental groups that are challenging a

17   U.S. Department of Defense (DoD)[1] decision, made jointly with the Government of Japan, to

18   construct a new military base on Okinawa.  According to Plaintiffs, construction of two aircraft

19   runways on landfill in Henoko Bay will destroy critical feeding grounds and habitat for the Okinawa

20   dugong, a species of marine mammal similar to a manatee.  It is undisputed that the Okinawa

21   dugong is critically endangered.

22          Plaintiffs originally filed this lawsuit in 2003, arguing that DoD failed to "take into account"

23   any adverse effects that construction of the military base might have on the dugong.  Plaintiffs

24   contended that such action was necessary pursuant to section 402 of the National Historic

25   Preservation Act (NHPA).  This Court (Patel, J.) agreed with Plaintiffs, and in 2008 ordered the

26

27

28   _____

          [1] The Court refers to the Defendants in this case alternatively as DoD or "the Government."

United States District Court

For the Northern District of California

1   DoD to comply with the NHPA.  DoD completed a report intended to satisfy its NHPA obligations

2   in April 2014.

3       Now, with construction of the military base apparently underway, Plaintiffs seek to challenge

4   the DoD's NHPA findings under the Administrative Procedures Acts (APA).  Specifically, Plaintiffs

5   ask this Court for (1): a declaratory judgment that the DoD's NHPA findings are arbitrary and

6   capricious, or otherwise violate the APA; (2) an order setting the Government's NHPA findings

7   aside; and (3) an injunction prohibiting the DoD from building the military base until it complies

8   with its NHPA obligations.

9       The Government moves to dismiss Plaintiffs' case pursuant to the political question doctrine.

10  According to the Government, this Court lacks jurisdiction to grant any of the relief requested by

11  Plaintiffs because the DoD's decision to construct a military base overseas is an unreviewable

12  Executive decision made at the apex of the President's foreign policy and national defense powers.

13      For the reasons explained below, the Court grants the Government's motion to dismiss, albeit

14  on slightly different grounds than the Government requests.  The Government is correct that

15  Plaintiffs' claim for injunctive relief is barred by the political question doctrine.  Put simply, this

16  Court lacks the power or necessary competence to enjoin or otherwise interfere with the construction

17  of a U.S. military facility overseas that is being built consistent with American treaty obligations and

18  in cooperation with the Japanese Government.  And while this Court does have the power to grant

19  Plaintiffs' request for declaratory relief that the DoD did not comply with the NHPA, and similarly

20  has the power to order the DoD's NHPA findings set aside, the Court will nevertheless grant the

21  Government's motion to dismiss these claims because any action the Court takes with respect to the

22  NHPA findings will not redress Plaintiffs' injuries.  After decades of negotiations, the American and

23  Japanese governments have made a final and (apparently) irreversible decision to construct the

24  challenged military base, and as suggested above, this Court lacks the power to enjoin or otherwise

25  alter that decision.  Given that the military base will be built regardless of what this Court might

26  determine regarding the DoD's compliance with the procedural mandates of the NHPA, Plaintiffs

27  cannot show that an order requiring the Government's compliance with a purely procedural statute

28

will in any way redress their claimed injuries.  Thus, for the reasons explained at length below,

Plaintiffs' entire lawsuit is hereby dismissed with prejudice.

## I.    BACKGROUND

A.    Factual Background

    1.    The Okinawa Dugong

       The dugong is a species of herbivorous marine mammal related to the manatee.  *See*

*Okinawa Dugong v. Gates*, 543 F. Supp. 2d 1082, 1083 (N.D. Cal. 2008).[2]  The dugong is listed as

"endangered" under the United States Endangered Species Act (ESA), and is classified as vulnerable

by the Word Conservation Union "due to habitat destruction and degradation, as well as human

exploitation."  *Id.* at 1084.  The dugong is also listed as "critically endangered in Japan."  *Id.*

       "The Okinawa dugong (*Dugong dugon*) is a small, isolated population of the Dugong species

found in the waters off the eastern coast of Okinawa."  *Dugong v. Rumsfeld*, No. 03-cv-4350-MHP,

2005 WL 522106, at *3 (N.D. Cal. Mar. 2, 2005).  As admitted by the Government, the Okinawa

dugong population is quite small: it "was estimated at fewer than 50 by the Mammalogical Society

of Japan in 1997."  Docket No. 152-1, Ex. 1 (Government's NHPA Findings) at 7.

       Plaintiffs and the Government agree that dugong were once "significant in Okinawan

culture."  *Okinawa Dugong*, 543 F. Supp. 2d. at 1084.  "They are associated with traditional

Okinawan creation mythology, sometimes being considered the progenitor of the local people."  *Id.*

The dugong "was featured in myths and songs, and had a traditional role in Okinawan culture that

included use of its meat for consumption and its bones for tool-making."  NHPA Findings at 7.  The

Government contends (and Plaintiffs dispute) that in modern times, the dugong's cultural

significance is acknowledged "by only very small segments of the Okinawa population rather than

society as a whole."  *Id.* at 9-10.  But what is not disputed is that the Okinawa dugong "is a protected

'natural monument' under [Japan's] 'Law for the Protection of Cultural Properties.'"  *Dugong*, 2005

WL 552106, at *3.

---

     [2] Where feasible, the Court draws undisputed facts from Judge Patel's earlier opinions in this case.  Both of Judge Patel's cited opinions contain detailed factual and procedural histories germane to this motion.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

2.     The Plaintiffs

Plaintiffs in this case are three individual Japanese citizens and four international environmental organizations – Center for Biological Diversity, Turtle Island Restoration Network, Japan Environmental Lawyers Foundation, and Save the Dugong Foundation.  *See* Docket No. 152-1 (Plaintiffs' Supplemental Complaint) at ¶¶ 8-14.  Each of the three individual plaintiffs appears to live in Japan, and at least two appear to live on Okinawa.  *See id.* at ¶¶ 12-14.  Two of the individual plaintiffs lead "regular eco-tours to Okinawa dugong habitat," and one guides tours that include "up-close snorkeling and scuba diving" in dugong habitat.  *Id.* at ¶¶ 12-13.  Each of the four plaintiff associations claims to have members with an interest in the preservation and/or enjoyment of the Okinawa dugong.  *Id.* at ¶¶ 8-11.  This Court previously ruled that all of the current plaintiffs have standing to bring this lawsuit.  *See Okinawa Dugong*, 543 F. Supp. 2d at 1096-1097.

3.     The United States Military Presence on Okinawa

The United States has maintained military bases on Okinawa since the end of World War II.  *Dugong*, 2005 WL 552106, at *1.   Between 1945 and 1972, the United States administered Okinawa pursuant to international agreements, while Japan retained residual sovereignty over the island chain.  *Okinawa Dugong*, 543 F. Supp. 2d at 1084.  Full Japanese sovereignty was restored in 1972 pursuant to the "Agreement Between the United States Concerning the Ryuku Islands and the Daito Islands" (the Agreement), and the "United States relinquished to Japan all administrative rights and interests it had over the Okinawa Islands." *Id.*  The Agreement did, however, grant the "United States exclusive use of facilities and areas [on Okinawa] in accordance with the 'Treaty of Mutual Cooperation and Security' ('Treaty') and the 'Status of Forces Agreement' ('SOFA')." *Id.*  SOFA is a bilateral agreement between the United States and Japan governed by the Treaty, which provides that "for the purpose of contributing to the security of Japan and the maintenance of international peace and security in the Far East, the United States of America is granted the use by its land, air and naval forces of facilities and areas in Japan." *Id.*

One such military facility operated by the United States is the Marine Corps Air Station Futenma (MCAS Futenma), which "operates facilities and provides services and materials to support Marine Corps aircraft operations." *Dugong*, 2005 WL 552106, at *1.   "MCAS Futenma is located

4

United States District Court
For the Northern District of California

in Ginowan City and due to social and economic changes [since it first opened], is now completely surrounded by urban development.  Japanese officials have called for its closure and relocation to a more suitable site in order to ease the health and safety burdens on the citizens of Ginowan City." *Okinawa Dugong*, 543 F. Supp. 2d at 1085.  American officials have also sought to relocate MCAS Futenma, "citing a desire to relocate military activities to a less congested area," and have been pursuing that goal jointly with the Japanese since at least 1996.  *Id*; *see also* Docket No. 91-3 (Declaration of Takemasa Motiya, Administrative Vice Minister for Defense, Japanese Ministry of Defense) at ¶ 3 (describing 1996 agreement between President Clinton and Prime Minister Hashimoto to close and relocate MCAS Futenma).

The relocation process since 1996 has been long and tortured, but significant headway was made in 2006 when then-Secretary of Defense Donald Rumsfeld and then-Secretary of State Condoleezza Rice agreed with their Japanese counterparts on a bilateral executive agreement entitled the "United-States-Japan Roadmap for Realignment Implementation" (Roadmap).  *See Okinawa Dugong*, 543 F. Supp. 2d at 1086.  The Roadmap "covers a number of restationing and military realignment issues in addition to the planned closure, return, and relocation of MCAS Futenma."  *Id.*  Specifically with respect to MCAS Futenma, the Roadmap establishes that Japan will construct a replacement base, known as the Futenma Replacement Facility (FRF) offshore from Camp Schwab, an existing onshore military base located adjacent to Henoko and Oura Bays.  *See generally id.*; *see also* Docket No. 163 (Motion to Dismiss), Exhibit 2 (May 1, 2006, U.S. State Department Press Release) (outlining details of the Roadmap agreement).[3]  Even more specifically, the Roadmap calls for the construction of the FRF with a "V-shaped" runway[4] that will be "built on landfill extending into Oura and Henoko Bays.  Each runway will be 1,600 meters in length plus 200

---

[3] The Government correctly argues that this Court may take judicial notice of official Government press releases.  *See, e.g.*, *Stepski v. M/V NORASIA ALYA*, No. 06-cv-06194, 2010 WL 6501649, at *5 (S.D.N.Y. Jan. 14, 2010) ("[T]he Court may take judicial notice of a Government-issued press release as a matter of public record") (citation omitted); *Perkins v. Linkedin Corp.*, -- F. Supp. 3d --, 2014 WL 6618753, at *9 (N.D. Cal. 2014) (taking judicial notice of official press release).

[4] The "V-shaped" runway (singular) is actually comprised of two separate runways connecting at the middle, as one might expect from the "V-shaped" nomenclature.

meters as 'overrun' areas." *Okinawa Dugong*, 543 F. Supp. 2d at 1086.  The Roadmap further calls for the relocation of a number of Marines and their dependents from Okinawa to facilities to be constructed in Guam, and provides for the United States' complete return of the lands now occupied by MCAS Futenma (and other bases) to Japan once the FRF is fully operational.  *See* Docket No. 163, Declaration of James P. Zumwalt, Deputy Assistant Secretary of State for East Asian and Pacific Affairs (Zumwalt Decl.) at ¶6; *see also* Motion to Dismiss, Exhibit 3.

Although the Roadmap was approved in 2006, serious construction work on the FRF or its runways has yet to begin.  *See* Plaintiffs' Supplemental Complaint at ¶¶ 25-26 (citing  Japanese media reports from 2014 indicating that certain "buildings within the proposed FRF runway footprint" have been demolished, and noting that "reclamation" work on the "nearshore area" is expected to begin in early 2015); Zumwalt Decl. at ¶ 8 (declaring that "boring sample surveys" began in August 2014).   That does not mean, however, that the project has lied dormant since 2006.  To the contrary, during this time the FRF project underwent "years of coordination and planning" at the highest levels of the U.S. and Japanese governments.  Zumwalt Decl. at ¶ 7; *see also* Mot. to Dismiss, Exhibit 5 (December 2013 White House press release quoting Vice President Biden: "The President and I are determined, the United States is determined to implement our [R]oadmap to relocate the base for Futenma as quickly as possible").  Part of this planning involved completion by the Japanese government of both a draft environmental impact statement (in 2009) and a final environmental impact statement (in 2012), which statements address the various environmental impacts of the proposed construction of the FRF and its runways, including potential impacts on the dugong.  *See, e.g.*,  NHPA Findings at 5.  As will be discussed in significant detail below, the Marine Corps also produced its own report during this time regarding possible impacts the Okinawa dugong might sustain from the construction and operation of the FRF.  *See generally* NHPA Findings.

In 2013, the FRF project gained significant momentum.  In March of that year, the Japanese government submitted a landfill permit request to the Governor of Okinawa.  Zumwalt Decl. at ¶ 8.  In what the Government hails as a "historic moment for the U.S.-Japan Alliance," the Governor approved the permit on December 27, 2013, clearing the last major hurdle to construction of the

United States District Court

For the Northern District of California

1  FRF. *Id.*; *see also id.* at ¶ 10 (describing approval of the landfill permit as "the most tangible,

2  significant achievement" of the 20 year effort between the U.S. and Japan to build the FRF).  As

3  noted above, Plaintiffs allege that limited construction work has now begun on the FRF, with more

4  significant construction to follow in the coming years.  *See* Plaintiffs' Supplemental Complaint at ¶¶

5  25-26.

6  B.      Procedural Background.

7          Plaintiffs filed this lawsuit against the DoD and its then Secretary, Donald Rumsfeld

8  (collectively, the Government), on September 25, 2003.[5]  *See* Docket No. 1.   The crux of Plaintiffs'

9  claims filed over a decade ago remains largely the same as it is now: The construction and operation

10  of the FRF is likely to have serious adverse consequences for the Okinawa dugong.  *Compare*

11  Docket No. 1 *with* Plaintiffs' Supplemental Complaint.  Specifically, Plaintiffs' most recent

12  allegations state that "[t]he proposed construction and operation of the FRF will harm Okinawa

13  dugong habitat and food sources, directly and adversely affecting the Okinawa dugong.  Landfill

14  from the construction of the facility, stormwater runoff, water pollution, air pollution, noise, and

15  light from the operation of the FRF may directly and adversely affect the continued survival of the

16  Okinawa dugong."  Plaintiffs' Supplemental Complaint at ¶ 28.  Plaintiffs note pointedly that

17  Henoko Bay, where the FRF runways are slated to be constructed on landfill, contains seagrass beds

18  that are "critical for dugong survival."[6]  *Id.* at ¶ 20.

19          Plaintiffs' original complaint alleged that the Government violated section 402 of the NHPA

20  by failing to "take into account" any adverse effects that the design, planning, or eventual

21  construction of the FRF might have on the Okinawa dugong.  *See, e.g.*, Docket No. 13 (Plaintiffs'

22  First Amended Complaint) at ¶ 39.  Section 402 of the NHPA provides that:

23              Prior to the approval of any Federal undertaking outside the United
                States which may directly and adversely affect a property which is on

24

25          [5] The Secretary of Defense was sued in his official capacity.  This case was originally
    assigned to (now retired) U.S. District Judge Marilyn Hall Patel.  Docket No. 10.

26

27          [6] The Government agrees that seagrass beds exist in Henoko Bay near the proposed FRF site,
    but dispute whether these feeding grounds are being actively used by any Okinawa dugong.  *See*
28  Mot. to Dismiss at 13 (claiming that the "Navy concluded that individual dugongs are present only
    sporadically or intermittently within the affected area").

United States District Court

For the Northern District of California

the World Heritage List or on the applicable country's equivalent of the National Register, the head of a Federal agency having direct or indirect jurisdiction over such undertaking *shall take into account* the effect of the undertaking on such property for the purposes of avoiding or mitigating any adverse effects.

16 U.S.C. § 470a-2 (emphasis added).[7]  Because the "NHPA does not provide an independent basis for judicial review of agency actions," *Dugong*, 2005 WL 522106 at *5, Plaintiffs claimed that the Government's failure to "take into account" any potential effects on the dugongs was a violation of the APA, and specifically section 706, which provides that a court may "compel agency action unlawfully withheld or unreasonably delayed," and/or hold unlawful and set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. §706(1)-(2)(A).

"In a Civil Pretrial Order entered March 15, 2004, the court directed the parties to file [pre-discovery] motions for summary judgment limited to the issue of the application of the NHPA to this case." *Dugong*, 2005 WL 522106 at *3.  In its motion, the Government contended that the NHPA did not apply here because: (1) the Japanese Law for the Protection of Cultural Properties, which lists the dugong as a natural monument, is not "equivalent" to the National Register of Historic Places; (2) the dugong cannot constitute "property" under the NHPA; and (3) the DoD had taken no action that constitutes a "federal undertaking," as each of those quoted terms are used in section 402. *See Id.*  In a lengthy opinion, Judge Patel rejected the Government's arguments, finding that the NHPA *could* apply to the Government's conduct as alleged by Plaintiffs.  *Id.* at *18.  Specifically, the Court held that the dugong qualifies as a protected "property" under the NHPA, and further determined that DoD's decision to relocate MCAS Futenma to Camp Schwab could qualify as a "federal undertaking," thereby triggering NHPA review.[8]  *Id.* at *8, 12, 18.

---

[7] As indicated, NHPA section 402 is codified at 16 U.S.C. § 470a-2.  In this Court's previous orders, the Court sometimes referred to the two code sections interchangeably as section 402 or section 470a-2.  For sake of consistency and clarity in this Order, the Court will refer to the relevant statutory language simply as "section 402."

[8] The Court also rejected the Government's contentions that it lacked subject matter jurisdiction because the NHPA "does not apply extraterritorially" and that the case should be dismissed pursuant to the act of state doctrine.  *See id.* at *18-20.

8

United States District Court

For the Northern District of California

1    Shortly following the May 2006 joint announcement of a final agreement to construct the

2    FRF at Camp Schwab (*i.e.*, the Roadmap), Plaintiffs filed a Second Amended Complaint.  Docket

3    No. 69-1 (Second Amended Complaint).  In that complaint, Plaintiffs once again alleged that the

4    DoD had failed to comply with the "take into account" requirement of the NHPA, in violation of the

5    APA.  *See id.* at ¶¶ 42-45.  Each side filed summary judgment motions in the summer of 2007.  *See*

6    Docket No. 85 (Plaintiffs' Motion for Summary Judgment), Docket No. 90 (Defendant's Cross-

7    Motion for Summary Judgment).

8    On January 24, 2008, the Court granted Plaintiffs' motion for summary judgment and denied

9    the Government's motion.  *See Okinawa Dugong*, 543 F. Supp. 2d at 1112.  In its order, the Court

10   first explained that NHPA's "take into account" requirement applied to the DoD because: (1) "there

11   is no issue of material fact as to whether DoD activities related to the Futenma Replacement Facility

12   [FRF] constitute a 'federal undertaking' under NHPA section 402," and (2) "there is no material

13   issue of fact as to whether the FRF may 'directly and adversely affect' the dugong."  *Id.* at 1101-02

14   (quoting 16 U.S.C. § 470a-2).

15   The Court next elucidated the "meaning of 'take into account' under section 402 . . . an issue

16   of first impression for the courts."  *Id.* at 1102 (quoting 16 U.S.C. § 470a-2).  The Court concluded

17   that the take into account process must minimally include:

18        (1) identification of protected property, (2) generation, collection,
         consideration, and weighing of information pertaining to how the
19        undertaking will affect the historic property, (3) a determination as to
         whether there will be adverse effects or no adverse effects, and (4) if
20        necessary, development and evaluation of alternatives or modifications
         to the undertaking that could avoid or mitigate the adverse effects.

21

22   *Id.* at 1104.  The Court further noted that "a federal agency does not complete the take into account

23   process on its own, in isolation, but engages the host nation and other relevant private organizations

24   and individuals in a cooperative partnership."  *Id.*

25   After analyzing copious exhibits and declarations in the record, Judge Patel ultimately

26   concluded that DoD failed to comply with NHPA section 402 because the "record contains no

27   evidence that a single official from DoD with responsibility for the FRF has considered or assessed

28   the available information on the dugong or the effects of the FRF."  *Id.* at 1108-1111.  Judge Patel

United States District Court

For the Northern District of California

1    then determined that DoD's failure to comply with the NHPA was "agency action that is

2    unreasonably delayed and unlawfully withheld," in violation of the APA. *Id.* at 1112.

3    Consequently, the Court ordered the Government to comply with NHPA section 402 by "evaluating

4    the effects of the FRF on the dugong" and taking that "information into account for the purpose of

5    avoiding or mitigating adverse effects to the dugong." *Id.* The Court further ordered the case held

6    in abeyance until the Government complied with the NHPA.[9] *Id.*

7          After the Court's summary judgment ruling, the parties submitted a number of briefs and

8    status reports with the Court debating the specific steps DoD should take in order to comply with the

9    Court's Order. *See, e.g.*, Docket Nos. 120, 126. Eventually, the dispute triggered the Court to

10   request proposed orders from both parties regarding the compliance issues. Docket No. 131. The

11   Government requested that any eventual order be final and appealable so that the Government could

12   obtain appellate review of the Court's NHPA determinations. Docket No. 130 at 4. For its part,

13   Plaintiffs agreed to "consent to an interlocutory appeal on threshold legal questions regarding the

14   applicability of the NHPA to the dugong and to the FRF project." *Id.* at 6. Ultimately, the Court did

15   neither. Instead, on February 10, 2012, the Court ordered the case administratively closed *sua*

16   *sponte*. Docket No. 147 (Order re Status). The Court explained that it had been receiving status

17   reports since 2008 regarding further proceedings, and acknowledged that the Government had

18   requested the Court issue a final order remanding the case to the relevant agency for compliance

19   with the NHPA. *Id.* at 2. For their part, Plaintiffs had asked "the court to set forth the procedures

20   necessary for defendants to satisfy their 'take into account' obligations under the NHPA." *Id.* The

21   Court found each request "premature," and went on to note that recent news accounts "raise serious

22   questions about where the FRF plans stand and whether they may, in fact, be modified, significantly

23   cut back or abandoned." *See id.* at 2-4. The Court concluded its order by noting that "this action

24   remains in abeyance and the Clerk of Court is instructed to administratively close the file. When

---

25

26          [9] Before the Court reached the merits of Plaintiffs' NHPA argument, the Court also held that
     these Plaintiffs have standing to sue, and rejected a number of the Government's other arguments,
27   including the Government's contention that there was no "final agency action" under the APA, that
     the Plaintiffs' claims were not ripe, that Japanese construction of the FRF rendered the case non-
28   justiciable under the act of state doctrine, and that the Government of Japan was a necessary and
     indispensable party under FRCP 19. *See Okinawa Dugong*, 543 F. Supp. 2d at 1090.

United States District Court
For the Northern District of California

1    plans for [the FRF] become more finalized or are abandoned, the parties may seek reopening of the

2    proceedings by letter without the necessity of a motion." *Id.* at 5.

3          On April 16, 2014, the Government filed a notice with the Court that it had completed the

4    NHPA process for the FRF project.  Docket No. 151.  On July 31, 2014, Plaintiffs filed a motion for

5    leave to file their First Supplemental Complaint.  Docket No. 152.  The Clerk of this Court officially

6    reopened the case on August 5, 2014, and it was reassigned to the undersigned the same day in light

7    of Judge Patel's retirement from the bench.  Docket No. 154.  The parties then reached a stipulation

8    (later approved by this Court) that the Government would not oppose Plaintiffs' motion to file its

9    First Supplemental Complaint if it received extra time to prepare its responsive pleading.  Docket

10   No. 156.  The Government filed its currently pending motion to dismiss for lack of jurisdiction on

11   September 29, 2014.  Docket No. 163 (Motion to Dismiss).  As discussed in great detail below, the

12   Government argues that this case should be dismissed because it currently presents only non-

13   justiciable "political questions" not appropriate for resolution by the judicial branch.  *See id.*  The

14   Plaintiffs filed an opposition on October 27, 2014, and the Government replied November 10, 2014.

15   Docket Nos. 167-68.  The Court heard extensive oral argument on the Government's motion on

16   December 12, 2014.  Docket No. 179.

17         At oral argument, counsel for Plaintiffs raised for the first time the issue of whether Plaintiffs

18   might be entitled to more "limited" relief than what they prayed for in their current complaint.  *See*

19   Docket No. 174.  Specifically, Plaintiffs' counsel suggested the Court might grant a "limited

20   injunction" that would not halt the FRF project, but which would instead direct "the DoD to consult

21   with, for instance, domestic agencies and experts without necessarily implicating the Japanese

22   government" and which would require DoD to evaluate only responses to the FRF project from

23   domestic sources.  *See* Docket No. 180 (Oral Argument Transcript) at 39:21-41:3.  The Court

24   ordered supplemental briefing on the issue.  In their supplemental brief, Plaintiffs abandoned their

25   suggestion that such "limited" injunctive relief could (or should) be fashioned.  Docket No. 182

26   (Plaintiffs' Supplemental Brief) at 1-3, 3 n. 2.

27

28

United States District Court

For the Northern District of California

## II.   DISCUSSION

The Government argues that all of the Plaintiffs' claims run afoul of the political question doctrine, which "'excludes from judicial review those controversies which resolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.'"  *El-Shifa Pharmaceutical Indus. Co. v. U.S.*, 607 F.3d 836, 840 (D.C. Cir. 2010) (en banc) (quoting *Japanese Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)).  The Court agrees with the Government that Plaintiffs' injunctive relief claim, which asks this Court to stop construction of a U.S. military facility overseas that has been approved by both the American and Japanese governments, and which is being built by the Japanese on their own sovereign soil, runs afoul of the political question doctrine.  And while the Court disagrees with the Government that the political question doctrine bars consideration of Plaintiffs' declaratory judgment claims, the Court ultimately finds that these claims are nevertheless non-justiciable because Plaintiffs cannot satisfy the redressability requirement of Article III of the Constitution.

A.   Overview of the Political Question Doctrine

The political question doctrine was born by Chief Justice Marshall in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), where the Court observed that "[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Id.* at 170.  "Although the principle behind the political question doctrine was announced over two hundred years ago in *Marbury*, the Supreme Court has addressed the doctrine in surprisingly few cases." *Alperin v. Vatican Bank*, 410 F.3d 532, 544 (9th Cir. 2005) (citations omitted).  Perhaps for that reason, the doctrine has been labeled "'the most confusing of the justiciability doctrines'" and one that seems to "'diverge, combine, appear, and disappear in seeming disorderliness' in various settings." *Id.* (quoting first Erwin Chemerinsky, Constitutional Law: Principles and Policies: § 2.8.1 (1997) and then quoting *Baker v. Carr*, 369 U.S. 186, 210-211 (1962)).

At the outset, it is important to note that the political question doctrine is a "narrow exception" to the typical rule that provides that the "Judiciary has a responsibility to decide cases properly before it, even those it would gladly avoid." *Zivotofsky ex rel. Zivotofsky v. Clinton*

1   (*Zivotofsky I*), 132 S. Ct. 1421, 1427 (2012) (quoting *Cohens v. Virginia*, 6 Wheat. 264, 404 (1821))

2   (internal quotation marks omitted).  That responsibility will sometimes involve resolution of "issues

3   [that] have political implications," *id.* at 1428 (citations omitted), but this Court may not shirk its

4   duty to "say what the law is," *Marbury*, 5 U.S. (1 Cranch) at 177, "merely because [its] decision

5   may have significant political overtones."  *Japanese Whaling Ass'n*, 478 U.S. at 230; *see also Baker*,

6   369 U.S. at 211 ("[I]t is error to suppose that every case or controversy which touches foreign

7   relations lies beyond judicial cognizance.").

8         The Supreme Court provided its most comprehensive discussion of the application of the

9   political question doctrine in the landmark case of *Baker v. Carr*.  369 U.S. 186.  "The Court

10  explained that the political question doctrine has its roots in the separation of powers and set forth

11  six formulations for courts to consider in determining whether they should defer a case to the

12  political branches:

> Prominent on the surface of any case held to involve a political
> question is found [1] a textually demonstrable commitment of the
> issue to a coordinate political department; or [2] a lack of judicially
> discoverable and manageable standards for resolving it; or [3] the
> impossibility of deciding without an initial policy determination of a
> kind clearly for nonjudicial discretion; or [4] the impossibility of a
> court's undertaking independent resolution without expressing lack of
> respect due coordinate branches of government; or [5] an unusual need
> for unquestioning adherence to a political decision already made; or
> [6] the potentiality of embarrassment from multifarious
> pronouncements by various departments on one question."

19  *Alperin*, 410 F.3d at 544 (quoting *Baker*, 369 U.S. at 217).

20        "Dismissal on the basis of the political question doctrine is appropriate only if one of these

21  formulations is 'inextricable' from the case."  *Id.* (quoting *Baker*, 369 U.S. at 217).  To "find a

22  political question, we need only conclude that one of these factors is present, not all."  *El-Shifa*

23  *Pharmaceuticals*, 607 F.3d at 841 (citing *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir.

24  2005)) (internal alterations omitted).  That said, the first two *Baker* tests (*i.e.*, a textually

25  demonstrable commitment or a lack of judicial standards) are the most important, and are typically

26  entitled to the most weight.  *See Alperin*, 410 F.3d at 545-46, *see also Zivotofsky I*, 132 S. Ct. at

27  1427 (discussing only the first two *Baker* tests); *Zivotofsky I*, 132 S. Ct. at 1432-33 (Sotamayor, J.,

28  concurring) (expressing doubt that the final four *Baker* factors can support dismissal, except in rare

United States District Court

For the Northern District of California

13

**United States District Court**
For the Northern District of California

1    cases); *Powell v. McCormack*, 395 U.S. 486, 548-49 (1969) (dismissing five *Baker* formulations as

2    inapplicable in two paragraphs after an extensive discussion of the first test).[10]

3          Before turning to the merits of this case, it is absolutely critical to note one final doctrinal

4    caveat:  The political question doctrine must be applied surgically – it is "incumbent upon [this

5    Court] to examine each of the claims with particularity." *Alperin*, 410 F.3d at 547.  This is because

6    the applicability of the political question doctrine "turns not on the nature of the government

7    conduct under review but more precisely on the question the plaintiff raises about the challenged

8    action." *El-Shifa Pharmaceuticals*, 607 F.3d at 842 (citation omitted).  Indeed, this point was most

9    recently illustrated in *Zivotofsky I*, where the Supreme Court reversed the lower courts'

10   determination that the claim at issue presented a political question because those courts

11   "misunderst[ood] the issue presented."  132 S. Ct. at 1427.  In that case, the lower courts had

12   understood the Plaintiff to "ask the courts to decide the political status of Jerusalem." *Id.* (citation

13   and internal quotation marks omitted*)*.  The Supreme Court noted that this frame was far too broad.

14   "Zivotofsky does not ask the courts to determine whether Jerusalem is the capital of Israel.  He

15   instead seeks to determine whether he may vindicate his statutory right . . . to choose to have Israel

16   recorded on his passport as his place of birth." *Id.*  As *Zivotofsky I* deftly illustrates, when applying

17   the political question doctrine it is crucially important to consider each claim individually and

18   carefully, and not at a high level of abstraction. *See id.*; *see also Alperin*, 410 F.3d at 548-62

19   (carefully considering each factually related claim and precisely determining that some present non-

20   justiciable political questions, while others do not); *People's Mojahedin Org. of Iran v. U.S. Dept. of*

21   *State*, 182 F.3d 17, 23-25 (D.C. Cir. 1999) (carefully parsing a three-part statute and holding that the

22   court could assess compliance with two subsections while review of the third subsection raised a

---

24       [10] Plaintiffs argue that the Supreme Court essentially abrogated or abandoned the final four
     *Baker* factors in *Zivotofsky I*, because the Supreme Court only addressed the first two factors in

25   holding that the case did not present a non-justiciable political question. *See* Docket No. 167
     (Plaintiffs' Opposition) at 15 n.3.  Plaintiffs are likely mistaken.  It is not surprising that the Justices

26   only addressed the two *Baker* factors considered most dispositive, but this does not show that the
     Court has abandoned the remaining factors, as Justice Sotomayor indicated in her concurrence. *See*

27   *Zivotofsky I*, 132 S. Ct. at 1432-33 (Sotomayor, J., concurring) (noting that only "[r]are occasions"
     implicate *Baker*'s final factors).  In any event, only the Supreme Court has "the prerogative of

     overruling its own decisions," *Agostini v. Felton*, 521 U.S. 203, 237 (1997), and *Zivotofsky I* does

28   not express any intent to overrule a part of *Baker*.

United States District Court

For the Northern District of California

1    non-justiciable political question).  The Court now analyzes the Government's contentions with the

2    above principles in mind.

3    B.    <u>Plaintiffs' Requests for Declaratory Relief and an Order Setting Aside the NHPA Findings</u>

4          <u>do not Present Political Questions</u>

5          The Government argues that Plaintiffs' entire lawsuit must be dismissed because the issues

6    in this case sit at the confluence of foreign policy and national defense, two matters where Executive

7    power is at its zenith and judicial power is at its nadir.  *See* Motion to Dismiss at 1-2, 16-17.  As the

8    Government correctly points out, national security and foreign relations cases "serve as the

9    quintessential sources of political questions."  *Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir.

10   2006).  Thus, "'[m]atters intimately related to foreign policy and national security are rarely proper

11   subjects for judicial intervention.'"  *Id.* (quoting *Haig v. Agee*, 453 U.S. 280, 292 (1981)); *see also*

12   *Alperin*, 410 F.3d at 558 (noting that courts "should refrain from hearing those claims that require

13   passing judgment on foreign policy decisions"); *Smith v. Reagan*, 844 F. 2d 195, 200 (4th Cir. 1988)

14   (noting that "[t]he judiciary cannot oversee the conduct of foreign relations," or "order the President

15   to take specific action" in the sphere of foreign relations).

16         Plaintiffs' first claim seeks a declaration that the DoD's NHPA Findings (that the FRF will

17   have no adverse effect on the Okinawa dugong) are "arbitrary, capricious, and not in accordance

18   with procedures required by law pursuant to the APA."  First Supplemental Complaint at ¶¶ 47-51,

19   Prayer for Relief at ¶ 1.  Plaintiffs contend, among other things, that the DoD violated the APA by:

20   failing to consult "interested parties" or "seek public comment" before issuing its Findings; resting

21   the Findings on faulty or incomplete data;[11] and failing to take into account numerous additional

22   impacts the FRF may have on the dugong population.[12]  *See, e.g.*, First Supplemental Complaint at

23

24   ────────────

25         [11] For instance, Plaintiffs call into question the DoD's reliance on a 1997 population study of
     the Okinawa dugong, which Plaintiffs allege even DoD acknowledges is "not sufficient to establish

26   population size, status, and viability of the Okinawa dugong."  First Supplemental Complaint at ¶
     44.

27         [12] For example, Plaintiffs allege that DoD failed to properly consider "the full range of
     possible adverse effects on the dugong caused by the FRF project, including population

28   fragmentation, [and] the disruption of travel routes . . . ."  First Supplemental Complaint at ¶ 43.

United States District Court

For the Northern District of California

1   ¶¶ 43-51.  Plaintiffs' second claim seeks an order setting aside the Findings on the basis of these

2   alleged APA violation(s).  Prayer for Relief at ¶ 2.

3          1.      Textually Demonstrable Commitment

4          The Government vociferously argues that Plaintiffs' declaratory judgment claims are non-

5   justiciable because "this case involves the Executive's performance of diplomatic and military

6   functions in fulfillment of decisions made jointly with a foreign power."  Mot. to Dismiss at 23.

7   Stated more precisely, the Government argues this case "inextricably" implicates the first *Baker*

8   factor because the Court cannot adjudicate Plaintiffs' declaratory judgment claims without passing

9   judgment on, or interfering with, the Executive's final (and plenary) decision to site and build an

10  overseas military base (the FRF) at Camp Schwab – a final decision also reached by the Japanese

11  government.  *See Bancoult*, 445 F.3d at 436 ("[T]he decision to establish a miliary base [overseas] is

12  not reviewable.").  But as was the case in the lower courts in *Zivotofsky I*, this statement of the issues

13  is far too broad, and fails to focus on the specific rights that Plaintiffs' declaratory judgment claims

14  seek to vindicate.

15         As Judge Patel correctly determined earlier in this case, the NHPA is a purely procedural

16  statute.  *Okinawa Dugong*, 543 F. Supp. 2d at 1095.  "It simply regulates the process by which an

17  undertaking is approved, requiring a federal agency to stop, look, and listen."  *Id.* (citation and

18  internal quotation marks omitted).  As such, "DoD's compliance with NHPA procedures would not

19  necessarily prevent the construction of the military facility nor result in a change in its design."  *Id.*

20  This is so because the NHPA "does not require a particular outcome and *it neither forbids*

21  *destruction of a protected property nor commands its preservation*."  *Id.*  (citations omitted)

22  (emphasis added).  "In other words, the challenged activity is not the undertaking itself, but the

23  process by which the effects of the undertaking are considered and assessed."  *Id.*

24         Given that the NHPA is purely a procedural statute, the Government errs when it claims that

25  Plaintiffs' challenge to DoD's compliance with the NHPA would very likely substantially

26  "interfere" with the Executive's exercise of his national security and foreign relations powers.  For

27  even if this Court eventually determined that DoD violated the NHPA, or ordered the NHPA

28  findings set aside, that would have no direct effect on the Government's decision to construct the

United States District Court

For the Northern District of California

1   FRF at Camp Schwab.[13]  Under such circumstances, even if declaratory relief were granted, the

2   Government would have no obligation to halt construction of the FRF, or otherwise alter its plans to

3   mitigate any effects to the dugong.

4   It is for this reason that Plaintiffs' declaratory judgment claims do not even implicate *Baker*'s

5   first factor, "a textually demonstrable constitutional commitment of the issue to a coordinate

6   political department."  *Baker*, 369 U.S. at 217.  As previously noted, the Government argues this test

7   is satisfied because in order to rule on the declaratory judgment claims, this Court would need to

8   consider (and potentially pass judgment on) the President's discretionary decision to build the FRF

9   at Camp Schwab.  But that is simply not true.  The only task this Court has in determining whether

10  the DoD complied with the NHPA is to determine whether DoD's NHPA Findings are "arbitrary,

11  capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA.[14]  That

12  is, this Court is called on to apply the standards of the APA to the process employed by the DoD, not

13  pass judgment on the wisdom of the Executive's ultimate foreign policy or military decisions.  As

14  the Supreme Court explained in *Zivotofsky I*, this type of statutory analysis – not dissimilar to more

15  typical environmental cases such as those brought under NEPA – is a "familiar judicial exercise."

16  *Zivotofsky I*, 132 S. Ct. at 1427.  Because "it goes without saying that interpreting congressional

17  legislation is a recurring and accepted task for the federal courts," and any decision whether the DoD

18  complied with the NHPA "presents a purely legal question of statutory" application, the first *Baker*

19  factor does not warrant dismissal of Plaintiffs' declaratory judgment claims.  *Japan Whaling Ass'n*,

20

21

22

23

---

24  [13] It is for this reason, as explained below, that Plaintiffs' declaratory judgment claims

25  nevertheless have to be dismissed because this Court cannot "redress" Plaintiffs' claimed injuries. *See* Section II.D.2, *infra*.

26  [14] In its Motion to Dismiss, the Government alludes to an APA exclusion whereby "decisions

27  made pursuant to executive authority over foreign relations are 'committed to agency discretion by law.'" Mot. to Dismiss at 22 (quoting 5 U.S.C. § 701(a)(2).  Because the issue was not truly raised or asserted in the Government's motion, the Plaintiffs do not respond to this argument, and the Court

28  declines to address it.

United States District Court
For the Northern District of California

1  478 U.S. at 230.  The mere fact that this Court's ultimate decision "may have substantial political

2  overtones," does not change that calculus.[15]  *Id.*

3    2.  Judicially Discoverable and Manageable Standards

4    The second *Baker* factors requires this Court to determine whether it "has the legal tools to

5  reach a ruling that is principled, rational and based upon reasoned distinctions."  *Alperin*, 401 F.3d at

6  552.  It is only where this Court is called on "to supplant a foreign policy determination of the

7  political branches with the court's own *unmoored determination* of what United States policy . . .

8  should be," that *Baker*'s second factor is implicated.  *Zivotofsky I*, 132 S. Ct. at 1427 (emphasis

9  added).

10    The Government argues that this Court lacks adequate standards (or competence) to evaluate

11  DoD's ultimate decisions regarding how to "maintain international peace and security in the Pacific"

12  by building the FRF at Camp Schwab, or constructing the FRF with runways that may destroy

13  critical dugong habitat.  Mot. to Dismiss at 29; *see also* Zumwalt Decl. at ¶ 10 (explaining that the

14  decision to build the FRF required delicate "balancing [of] the need for the United States to maintain

15  its deterrence capability with the need to sustain public support on Okinawa and elsewhere in

16  Japan").  But again, resolution of Plaintiffs' declaratory judgment claims would not require this

17  Court to assess the Executive's weighty appraisal of such issues as how to best "maintain

18  international peace."  Instead, this Court would need to determine whether the DoD's specific

19  NHPA findings violated the APA.  At this juncture, neither party has demonstrated that the critical

20  "take account" requirement of NHPA is qualitatively different from the analysis of the adequacy of

21  an environmental impact statement under NEPA or the quality of biological assessments under the

22

23    [15] The Government argues that the Plaintiffs do "not simply ask the court to interpret a
statute.  Instead, [they] ask the court to adjudicate the adequacy of processes adopted by the Defense
Department in a militarily and diplomatically sensitive setting."  Reply Brief at 13.  Quite right.  But
24  the fact that the Court must evaluate DoD's compliance with the NHPA in a politically sensitive
area simply does not mandate the Court abdicate its judicial function.  If that were the test of the
25  political question doctrine, its narrow "exception" would completely swallow the rule.  *Zivotofsky I*,
132 S. Ct. at 1427; *see also Jewel v. Nat. Security Agency.*, 673 F.3d 902, 912 (9th Cir. 2011)
26  (explaining that challenge to warrantless wiretapping involves "conduct that strikes at the heart of a
major public controversy involving national security and intelligence . . . That being said, although
27  the claims arise from political conduct in a context that has been highly politicized, they present
straightforward claims of statutory and constitutional rights, not political questions") (citing *Japan
28  Whaling Ass'n*, 478 U.S. at 230).

United States District Court

For the Northern District of California

1   Endangered Species Act.  *See, e.g.*, *San Luis & Delta-Mendoza Water Authority v. Jewell*, 747 F.3d

2   581, 591 (9th Cir. 2014) (reviewing adequacy of a biological opinion under the APA's arbitrary and

3   capricious standard).  Although the NHPA is different inasmuch as it applies to foreign sites and

4   may involve the obligation to secure the input of foreign agencies and citizens (as Judge Patel

5   assumed, *see Okinawa Dugong*, 543 F. Supp. 2d at 1104), neither party has argued and established

6   that the "take account" element of the NHPA incorporates any political (as opposed to scientific and

7   procedural) criteria and concerns which would implicate justiciability questions.  Hence, on this

8   record, there is no reason to believe the standards for the inquiry here would not entail judicially

9   "discoverable" or "manageable" standards.  *See generally Motor Vehicle Mfrs. Ass'n of United*

10  *States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining that an agency's action

11  is arbitrary and capricious if it fails to consider an important aspect of a problem, offers an

12  explanation for the decision that is contrary to evidence, is wholly implausible, or is contrary to

13  law); *see also Organized Village of Kake v. U.S. Dept. of Agriculture*, 746 F.3d 970, 974 (9th Cir.

14  2014) (adjudicating APA challenge, and applying the arbitrary and capricious standard to

15  Government rule change); *Nat. Wildlife Federation v. U.S. Army Corps of Engineers*, 384 F.3d

16  1163, 1172-75 (9th Cir. 2004) (adjudicating APA challenge, and applying the arbitrary and

17  capricious standard to the Government's operation of dams).

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

Cases relied upon by the Government in arguing that this case involves a non-justiciable political question are distinguishable.[16]  These cases share a common characteristic:  the statutes the courts were asked to apply lacked discoverable or manageable standards.[17]

In *Flynn v. Shultz*, the plaintiffs asked the court to interpret and apply The Hostage Act.  748 F.2d 1186 (7th Cir. 1984).  Specifically, plaintiffs asked the court to apply a statutory section that states:

> Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of the American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release . . .

22 U.S.C. § 1732 (the Hostage Act).

The plaintiffs in *Flynn* alleged that their family member was being unjustly and wrongfully detained by the Mexican government in violation of the Hostage Act.  *Flynn*, 748 F.2d at 1187.  The plaintiffs sought two forms of relief: (1) an order enforcing the President's duty of inquiry into the

---

[16] Whether the political question doctrine should ever come into play where a court is asked to interpret or apply a statutory command is a debated question.  As Judge Kavanaugh recently noted, the "Supreme Court has never applied the political question doctrine in a case involving alleged *statutory* violations.  Never."  *El-Shifa Pharmaceuticals*, 607 F.3d at 856 (Kavanaugh, J., concurring in judgment) (emphasis in original).  According to Judge Kavanaugh, this is for "good reason," because if the political question doctrine applied in cases alleging statutory violations, the court would be implicitly "establishing that the asserted Executive power is exclusive and preclusive, meaning that Congress cannot regulate or limit that power by creating a cause of action or otherwise."  *Id.* at 857; *but see Zivotofsky I*, 132 S. Ct. at 1436 (Sotomayor, J., concurring) (acknowledging that the application of the political question doctrine in a statutory case would be very "atypical," but suggesting that "the foreclosure altogether of political question analysis in statutory cases is unwarranted").

[17] The below-cited authorities could have been addressed in the Court's discussion of the first *Baker* factor, because at least some jurists and commentators have forcefully argued that a Court's resolution of statutory arguments "is not [] 'textually committed' to another branch; to the contrary, it is committed to this one."  *Zivotofsky I*, 132 S. Ct. at 1435 (Sotomayor, J., concurring); *see also* Erwin Chemerinsky, Federal Jurisdiction § 1.3, at 15 (5th ed. 2007) ("Under current law, the political question doctrine consigns certain allegations of *constitutional violations* to the other branches of government for adjudication and decision, even if all other jurisdictional and justiciability requirements are met.") (emphasis added).

United States District Court
For the Northern District of California

reasons for the imprisonment; and (2) an order "in the nature of mandamus or injunction" to compel the Executive branch to comply with the Hostage Act and provide assistance that could "obtain or effectuate" their family member's release.[18]  *Id.* at 1889.  The Seventh Circuit found the second request barred by the political question doctrine, but not the first.  The reasons for the court's determinations are important.  The court concluded that the plaintiffs' first request (to enforce the President's duty to "undertake a meaningful inquiry into the circumstances of [a citizen's] detention in order to determine whether the citizen is unjustly deprived of liberty") was justiciable because "our enforcement of a duty of inquiry does not interfere with the President's conduct of foreign relations, nor does our review of the extent of the inquiry implicate standards that are beyond judicial management or discovery."  *Id.* at 1195-96.  Put differently, the Court knew how to determine whether the Executive Branch had ever investigated a detainee's status, and similarly knew how to determine whether that investigation was sufficiently robust to satisfy the President's duty of inquiry under the Act.

By contrast, the plaintiffs' second request could not be granted because the requested injunction would not only "amount to directing the conduct of this country's foreign relations," *id.* at 1190, but would also require the "ascertainment of facts and standards of decision that are beyond judicial discovery and management."  *Id.* at 1193.  Namely, in order to determine whether the President violated the Hostage Act, the court would need to determine whether a detainee was "unjustly deprived" of his liberty by a foreign government.  *Id.*  This, the Seventh Circuit determined, it could not do.  *Id.*  The Court explained:  "Neither the terms of the Hostage Act nor its legislative history give any indication of what is meant by the phrase 'unjustly deprived,'" and "we simply lack the resources and competence to discover and resolve the questions of fact regarding events surrounding Flynn's incarceration and conviction in Mexico."  *Id.*; *see also Smith*, 844 F.2d at 198-99 (dismissing a Hostage Act claim because the court could not reasonably determine who was "unjustly deprived" of their liberty).

---

[18] Specifically, they sought to compel an American consular officer based in Mexico to provide a statement to the Supreme Court of Mexico on behalf of their detained family member.  *Id.* at 1189.

The Government's reliance on *Flynn* with respect to Plaintiffs' declaratory judgment claims is misplaced; the case, if anything, supports Plaintiffs in this context. Notably, the Seventh Circuit held that the political question doctrine did not bar it from enforcing the Executive's duty of inquiry under the Hostage Act or prohibit it from "review[ing] the extent of the inquiry" because neither action would "implicate standards that are beyond judicial management or discovery" or otherwise "interfere with the President's conduct of foreign relations." *Id.* at 1195. The same reasoning applies to Plaintiffs' declaratory judgment claims here.

The Court notes that the D.C. Circuit later applied similar reasoning to that employed by the Seventh Circuit in *Flynn*. In *People's Mojahedin Organization of Iran*, the court was called on to interpret and apply section 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 182 F.3d at 21. That section empowers "the Secretary of State to designate a foreign terrorist organization if the Secretary finds three things: (A) the organization is a foreign organization; (B) the organization engages in terrorist activity . . . and (C) the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States." *Id.* (internal quotation marks omitted). Section 1189 also provided "[i]n APA-like language" that the court shall "hold unlawful and set aside a designation" of a group as a foreign terrorist organization that the court finds to be "arbitrary, capricious, an abuse of discretion," or otherwise unlawful. *Id.* at 22.

Both the People's Mojahedin Organization of Iran and the Liberation Tigers of Tamil Eelam filed suit, seeking judicial review of their designation as a foreign terrorist organization. *Id.* at 18-19. The D.C. Circuit determined that the challenge was partially justiciable. Specifically, the court concluded that it could apply the "APA-like" standard of review to the Secretary's determinations that the plaintiff organizations were "foreign" and that they "engaged in terrorist activity," because those terms were defined by law, and thus there were judicially manageable and discoverable standards to guide the court's decision. *Id.* at 24-25. But, the panel concluded that it could not review the Secretary's final determination that the plaintiff organizations "threaten[ed] the security of United States nationals or the national security of the United States," because such a judgment would require the judiciary to made a decision "for which the Judiciary has neither aptitude,

United States District Court

For the Northern District of California

facilities nor responsibility." *Id.* at 23 (citing *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 111 (1948)).

Again, the same logic employed in *People's Mojahedin Organization of Iran* applies here. Consideration of the Plaintiffs' declaratory judgment claims is not barred by the political question doctrine because those claims merely require this Court to determine whether the DoD's NHPA process violated the APA's familiar "arbitrary and capricious" standard.

In sum, Plaintiffs' declaratory judgment claims do not implicate either of the first two (and most important) *Baker* factors because they ask this Court to perform the straightforward and familiar task of applying the APA.

3.  Initial Policy Determination

Nor do the Plaintiffs' declaratory judgment claims "inextricably" implicate the third *Baker* factor. As Justice Sotomayor recently explained in her concurrence in *Zivotofsky I*, the second and third *Baker* factors are largely overlapping, and "reflect circumstances in which a dispute calls for decisionmaking beyond courts' competence." *Zivotofsky I*, 132 S. Ct. at 1432 (Sotomayor, J., concurring). "When a court is given no standard by which to adjudicate a dispute, or cannot resolve a dispute in the absence of a yet-unmade policy determination charged to a political branch, resolution of the suit is beyond the judicial role envisioned by Article III." *Id.*

As previously noted, the Court's main task in resolving these claims is limited and straightforward (*i.e.*, applying the APA and determining compliance with procedural requirements), and would not in the first instance "require the court to make pronouncements of foreign policy." *Alperin*, 410 F.3d at 555. The Government, however, argues that this Court's application of the "arbitrary and capricious" standard of review might require the Court to engage in "policy determination[s] of a kind clearly for nonjudicial discretion." *Baker* 369 U.S. at 217. For instance, the Government argues that if this Court were to determine that DoD violated the APA by failing to solicit public comment before issuing its NHPA Findings, the Court might then have to decide how the Executive could appropriately receive public comment from citizens of Japan, a policy decision that would unnecessarily "intrude into the Executive's authority to determine . . . how to appropriately engage a foreign government's citizens." Mot. to Dismiss at 34.

United States District Court

For the Northern District of California

1    The problem with the Government's arguments at this juncture is that they are hypothetical

2  and not ripe.  There is no certainty that this Court would ever have to engage in the type of

3  "impermissible" policy analysis that animates the Government's concerns.  Indeed, it is entirely

4  possible that the NHPA findings would be upheld on the existing record.  In any event, as noted

5  above, it is by no means clear at this juncture whether the "take account" requirements of the NHPA

6  will require close scrutiny of the Government's effort to solicit input from Japanese officials and

7  citizens, or otherwise involve the weighing of other political factors.

8    As the case stands, the third *Baker* test, which requires that a Court's need to make an

9  impermissible policy determination be "*inextricable* from the case at bar,"  *Baker*, 369 U.S. at 217

10  (emphasis added), is not implicated.

11    4.    Lack of Respect for Coordinate Branches

12    The Government also argues that this Court would show a "lack of respect" for the Executive

13  Branch were the Court to adjudicate the declaratory judgment claims and consider whether the

14  NHPA Findings fell short of statutory requirements.  It is not immediately apparent how this might

15  be, and the Government's brief once again relies on speculative hypotheticals in an attempt to show

16  that APA review would be disrespectful of the President's handling of U.S.-Japan relations.  For

17  instance, the Government claims that were the Court to conclude that the DoD was wrong to rely on

18  the Japanese government's environmental impact statements or dugong population studies, or, even

19  worse, was to conclude that these Japanese government documents were somehow substantively

20  flawed, this could embarrass the Executive and undermine the U.S.-Japan relationship.

21    First, this argument suffers the same flaws as the Government's other hypothetical

22  "horribles."  There is currently no way to know that the Court would ever make such critical

23  assessments of the Japanese government's determinations, or the DoD's reliance on those

24  determinations.  Nor is it evident that the NHPA will be construed to require scrutiny of the political

25  nature of the Government's action.  But even if this Court were, in applying the NHPA, to somehow

26  call the Japanese government's competence or performance in providing sufficient environmental

27  input into doubt, it is unlikely that would be sufficient to trigger dismissal under the restrictive test

28  set out in *Baker*.

United States District Court

For the Northern District of California

Defendants contend that continued adjudication of this case will harm the U.S.-Japan relationship. The views of the Executive regarding the foreign policy consequences of a given lawsuit are entitled to some deference. *Compare Zivotofsky ex rel. Zivotofsky v. Secretary of State* (*Zivotofsky II*), 725 F.3d 197, 219 (D.C. Cir. 2013), *cert. granted by* 134 S. Ct. 1873 (2014) (holding that the Executive Branch's consistently held belief, supported by evidence, that enforcement of a statute would cause adverse foreign policy consequences is "conclusive on us") *with Alperin*, 410 F.3d at 556 (noting that had the State Department expressed a view on the foreign policy consequences of the court's decision, "that fact would certainly weigh in evaluating this fourth *Baker* formulation") *and Republic of Austria v. Altmann*, 541 U.S. 677, 701-02 (2004) (indicating in dicta that had the State Department chosen to "express its opinion on the implications of exercising jurisdiction over particular petitioners . . . that opinion might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy") (emphasis omitted). However, the declarations submitted by the Government in this case focus almost exclusively on the harms an *injunction*, not declaratory judgment, would cause to U.S.-Japan relations. Indeed, the only opinion expressed by the Executive with regard to the Plaintiffs' declaratory relief claims reads (in its entirety) as follows: "For that matter, in light of the United States' close coordination with Japan on plans for FRF construction, a court order setting aside DoD's findings with respect to the impact of the FRF on the dugong would also be damaging." Zumwalt Decl. at ¶ 12.

Even crediting the State Department's largely conclusory contention that an order granting declaratory relief setting aside DoD's NHPA Findings would be "damaging" to the U.S.-Japan alliance, such collateral consequences alone would not necessarily warrant dismissal under *Baker*. In *Japan Whaling Ass'n*, the Supreme Court was tasked with determining whether, under two Congressional statutes, the Japanese government should be certified (and thereby face significant economic sanctions) for violating the International Convention for the Regulation of Whaling. 478 U.S. at 226. The outcome of the case was extremely important to the Japanese government, so much so that Japan officially agreed to withdraw its objections to the whaling moratorium imposed under the whaling treaty "provided that the United States obtained reversal of the District Court's order,"

United States District Court
For the Northern District of California

1   which had held that Japan must be certified.  *Id.* at 228.  Despite Japan's expressed interest in the

2   litigation, and serious concern regarding an unfavorable Supreme Court ruling, the Court refused to

3   dismiss the case on political question grounds, holding that it could not "shirk" its responsibility to

4   "interpret statutes . . . merely because our decision may have significant political overtones."  *Id.* at

5   230.  Hence, the Supreme Court refused to invoke the political question doctrine in *Japan Whaling*

6   *Ass'n*, even where the potential harm to Japan (and the U.S.-Japan relationship more generally) that

7   could have stemmed from an adverse judgment was far more obvious than it is in this case.

8   Consequently, the Court concludes that the fourth *Baker* factor is not met.

9         5.    Unquestioning Adherence to a Political Decision Already Made

10        The Government also argues that the fifth *Baker* factor warrants dismissal in this case, but as

11  with many of its arguments, this one fails because the Government misconstrues the scope of the

12  Plaintiffs' declaratory judgment claims.  The "political decision already made" that the Government

13  argues this Court should unquestionably adhere to is the decision to build and site the FRF at Camp

14  Schwab, a final decision that DoD emphasizes was "exceptionally difficult" to reach, "has been

15  decades in the making, and has absorbed the energies of several Presidents and their Secretaries

16  (State and Defense) and their counterparts in Japan."  Mot. to Dismiss at 39 (citations omitted).  But

17  the decision the Plaintiffs' declaratory judgment claims seek to challenge is not the decision to build

18  the FRF, but DoD's specific implementation of the NHPA "take into account" process for the

19  Okinawa dugong.

20        6.    Multifarious Pronouncements

21        The final *Baker* factor asks whether this Court's adjudication of the declaratory judgment

22  claims would "cause the potentiality of embarrassment from multifarious pronouncements by

23  various departments on one question."  *Id.*  Arguably, should this Court declare that Japan's

24  environmental impact studies were insufficient or otherwise of poor quality, that could cause

25  embarrassment for the Executive.

26        However, as the Ninth Circuit stated in *Alperin*, although the Court must be "mindful of

27  stepping on the toes of the political branches," not "*any* adjudication of the claims would implicate

28  this final test."  *Alperin*, 410 F.3d at 558 (emphasis in original).  Declaratory relief would not be

United States District Court
For the Northern District of California

1  directed towards criticizing the policy decisions of the American and Japenese governments to

2  construct the new base; rather, if granted, it would hold only that statutory procedures were not

3  followed.

4       In sum, the Plaintiffs' declaratory judgement claims will not be dismissed pursuant to the

5  political question doctrine, for while they arise in the context of a political *case* they do not present a

6  non-justiciable political *question*, as seen by applying each of *Baker*'s six tests to these claims.

7  C.    Plaintiffs' Injunctive Relief Claim Presents a Non-Justiciable Political Question

8       In contrast to the declaratory judgment claims, Plaintiffs' injunctive relief claim clearly

9  presents a non-justiciable political question:  Plaintiffs' ask this Court for a "temporary" injunction

10 ordering the DoD to halt all construction of an overseas military base that is being paid for by the

11 Japanese government, built by Japanese workers, and erected on Japanese sovereign territory, until

12 the DoD adequately satisfies its obligations under the NHPA.  Prayer for Relief at ¶ 3.  Plaintiffs'

13 injunctive relief claim likely "inextricably" implicates a number of *Baker* factors.

14      Most importantly, Plaintiffs' injunctive relief claim fails the second *Baker* test.  This Court

15 has no judicially discoverable and manageable standard(s) to apply in deciding whether to grant or

16 deny the requested injunction.  In order to obtain an injunction in this case, Plaintiffs concede that

17 they would have to prevail on the merits and then show that: (1) they suffered an irreparable injury;

18 (2) their remedies at law are inadequate; (3) the balance of the hardships tips in Plaintiffs' favor; and

19 (4) the public interest would not be disserved by the injunction.  *See Sierra Forest Legacy v.*

20 *Sherman*, 646 F.3d 1161, 1184 (9th Cir. 2011) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S.

21 388, 391 (2006)); *see also* Plaintiffs' Supplemental Brief at 3 n. 1.  Even assuming that Plaintiffs

22 could satisfy the first two requirements, there are no judicially administrable standards available to

23 this Court in evaluating the remaining factors.

24      For instance, in evaluating the balance of the hardships, this Court would be required to

25 weigh the serious harm construction of the FRF will likely cause to the dugong (including possible

26 extinction) against claimed benefits of the FRF:  *e.g.*, maintaining the United States' "deterrence

27 capability" in Asia, "sustaining public support on Okinawa" for the United States military presence,

28 addressing the "threat posed by a nuclear-armed North Korea" or defusing "tensions over competing

United States District Court

For the Northern District of California

territorial and maritime claims in the East China Sea and South China Sea." *See* Zumwalt Decl. at ¶¶ 10, 13. Evaluating these types of harm is an exercise "for which the Judiciary has neither aptitude, facilities nor responsibility," and thus they "have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Waterman*, 333 U.S. at 111; *see also Bancoult*, 445 F.3d at 436 ("[W]e have no standards by which we can measure and balance the foreign policy considerations at play in this case, such as the containment of the Soviet Union in the Indian Ocean thirty years ago and the support of military operations in the Middle East today.") (internal quotation marks and modifications omitted); *El-Shifa Pharmaceuticals*, 607 F.3d at 843 ("The conclusion that the strategic choices directing the nation's foreign affairs are constitutionally committed to the political branches reflects the institutional limitations of the judiciary and the lack of manageable standards to channel any judicial inquiry into these matters."). As the D.C. Circuit recently held *en banc*, "[i]t is not the role of judges to second-guess, with the benefit of hindsight, another branch's determination that the interests of the United States call for military action." *El-Shifa Pharmaceuticals*, 607 F.3d at 844.

In addition to the near impossibility of assessing the balance of hardships in the instant case which entail examination of fundamental foreign policy concerns, this Court would have to adjudicate the fourth injunctive factor – whether the public interest would be disserved by an injunction. This presents yet another task the Judiciary is ill-suited to adjudicate. Government declarants make what appears to be a compelling case that even temporary injunctive relief would "have a significant negative impact on U.S. foreign policy interests in the region." Zumwalt Decl. at ¶ 4; *see also* Docket No. 163, Declaration of Brigadier General Mark R. Wise, Deputy Commander, United States Forces, Japan (Wise Decl.) at ¶ 14 (concluding that any failure to "live up to political commitments made . . . would inject not only uncertainty into the process of implementing the SOFA, [it] would also undermine the strength of the U.S.-Japan alliance more generally"). For instance, General Wise notes that any injunction of the FRF project "would be called into question by the GOJ [Government of Japan] as a significant failure of the alliance and a departure from the established norms of the relationship of the two governments." Wise Decl. at ¶ 14. And Deputy Assistant Secretary of State Zumwalt notes that an "injunction blocking construction of the FRF,

United States District Court
For the Northern District of California

even temporarily, would have far-reaching consequences" on the U.S.-Japan alliance which is a "central component of the United States' broader rebalance to Asia, a major policy priority for the President." Zumwalt Decl. at ¶¶ 13, 15. He also notes that an injunction would diminish "the United States' position as a reliable ally for its [other] partners." *Id.* at ¶ 4; *see also* Mot. to Dismiss, Exhibit 3 (quoting Secretary Hagel as stating that "[o]ur strong relationship with Japan remains vital to the rebalance" of U.S. forces to the Asia-Pacific region, and further noting that the U.S. is "committed to working with Japan to realize the expeditious construction of the FRF and realignment of U.S. forces"). As noted above, these assertions are entitled to weight. *See Alperin*, 410 F.3d at 556; *Zivotofsky II*, 725 F.3d at 219. Beyond that, this Court is ill-equipped to meaningfully evaluate the Government's contentions.

Because Plaintiffs' request for injunctive relief "inextricably" implicates one of *Baker*'s most important tests – the lack of judicially discoverable and manageable standards (*see Alperin*, 410 F.3d at 545) – the claim for injunctive relief presents a non-justiciable political question.

Issuance of an injunction would implicate other *Baker* factors as well. An injunction would effectively countermand the Government's decision to "establish a military base on [foreign soil]," a political decision generally not reviewable by the courts. *Bancoult*, 445 F.3d at 436. Such a choice is plainly "an exercise of the *foreign* policy and national security powers entrusted by the Constitution to the political branches of our government." *Id.* (emphasis added); *see also Alperin*, 410 F.3d at 559 ("It is axiomatic that the Constitution vests the power to wage war in the President as Commander in Chief."). *See El-Shifa Pharmaceuticals*, 607 F.3d at 844 ("[C]ourts cannot reconsider the wisdom of discretionary *foreign* policy decisions.") (emphasis added); *Alperin*, 410 F.3d at 559 (explaining that "cases interpreting the broad textual grants of authority to the President and Congress in the areas of *foreign affairs* leave only a narrowly circumscribed role for the Judiciary") ( emphasis added).

Similarly, an injunction that ascribes more importance to saving the Okinawa dugong than the Executive has chosen to afford in the context of constructing a foreign military base would "inevitably express a lack of respect for the Executive Branch's handling of" U.S.-Japan relations, *Alperin*, 410 F.3d at 555, and would also likely "cause the potentiality of embarrassment from

United States District Court

For the Northern District of California

1  multifarious pronouncements by various departments on one question." *Id.* at 558 (quotation

2  omitted).

3       Moreover, the Government's argument that the decision to build the FRF is a "political

4  decision already made" that requires an "unusual need for unquestioning adherence" appears well

5  taken. *See Baker*, 369 U.S. at 217. The United States and Japan signed a final executive agreement

6  to build the FRF in 2006 (the Roadmap). *See Okinawa Dugong*, 543 F. Supp. 2d at 1086 ("The

7  2006 Roadmap . . . is a bilateral executive agreement between two sovereign nations . . . . The

8  agreements reached in the Roadmap have received needed approvals at the national levels of both

9  governments, but the Government of Japan is still working to obtain needed approvals from affected

10  local and prefectural governments.");[19] *see also id.* at 1092 ("[T]he Roadmap is the final agreement

11  between the United States and the Government of Japan marking the consummation of years of

12  negotiation and planning."). Construction of the FRF has already begun, and both the American and

13  Japanese governments are committed to completing the FRF project expeditiously. *See* Zumwalt

14  Decl. at ¶ 8 ("I understand the Japanese government wants initial work on the FRF to proceed

15  expeditiously due to the desire to carry out the Realignment Roadmap in a timely manner"); Mot. to

16  Dismiss, Exhibit 1 (April 2014 White House press release "reaffirm[ing] our commitment to

17  reducing the impact of U.S. forces on Okinawa" through the "early relocation of Futenma Marine

18  Corps Air Station to Camp Schwab"); Mot. to Dismiss, Exhibit 5 (December 2013 White House

19  Press release indicating that the "United States is determined to implement our roadmap to relocate

20  the base for Futenma as quickly as possible"). The Executive Branch (in consultation with the

21  Japanese) has determined that there "are no viable alternatives to the FRF at Camp Schwab."

22  Zumwalt Decl. at ¶ 12.[20] The last *Baker* factor further counsels against justiciability.

---

[19] As noted earlier in this Order, all necessary additional approvals have now been obtained, and construction of the FRF has already begun. *See* Zumwalt Decl. at ¶ 10 (describing the Governor of Okinawa's approval of the landfill permit as "the most tangible, significant achievement" of the 20 year effort between the U.S. and Japan to build the FRF); *id.* at ¶ 8 (averring that construction surveys began in August); First Supplemental Complaint at ¶ 25 (alleging that "DoD has already issued work entry permits to Camp Schwab for construction of the FRF project").

[20] Judge Patel foresaw just such a problem in her 2008 summary judgment order: "Satisfaction of defendants' obligations under section 402 . . . cannot be postponed until the eve of construction when defendants have made irreversible commitments making additional review futile

United States District Court

For the Northern District of California

1    In conclusion, injunctive relief would inextricably implicate nearly all the tests of non-

2    justiciability under *Baker*.  Such a claim for relief must be dismissed.

3    D.    Plaintiffs' Declaratory Judgement Claims Must be Dismissed Because This Court Cannot

4          Fashion any Effective Relief

5          The inability of this Court to fashion any injunctive or otherwise coercive relief to protect the

6    dugong is also conclusive of another issue – Plaintiffs' standing to assert their remaining declaratory

7    judgment claims.[21]  If this Court cannot grant the Plaintiffs meaningful relief (*i.e.*, cannot redress

8    their injuries), their claims for declaratory judgment must also be dismissed even if these claims do

9    not in themselves present a political question.  *See Defenders of Wildlife v. U.S. EPA*, 420 F.3d 946,

10   957 (9th Cir. 2005) (holding that plaintiffs alleging procedural injury "must show only that they

11   have a procedural right that, if exercised, *could* protect their concrete interests") (emphasis in

12   original), *overruled on other grounds by Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551

13   U.S. 644 (2007).

14         1.    Basics of Constitutional Standing

15         To bring or maintain a lawsuit in federal court, a plaintiff must establish that she has Article

16   III standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Specifically, a litigant must

17   have "suffered an 'injury in fact'" that is "'concrete and particularized'" and "'actual or imminent.'"

18   *Mayfield v. United States* (*Mayfield II*), 599 F.3d 964, 969 (9th Cir. 2010) (quoting *Lujan*, 504 U.S.

19   at 560).  The plaintiff must also "establish a causal connection between the injury and the

20   defendant's conduct . . . [and] show a likelihood that the injury will be 'redressed by a favorable

21   decision.'"  *Id.* (quoting *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 43 (1976)).

---

23   or consideration of alternatives impossible."  *Okinawa Dugong*, 542 F. Supp. 2d at 1112.  Rather,
     "Congress' express inclusion of a time frame [in section 402, requiring review to take place 'prior to
24   approval of an undertaking'] indicates that Congress intended the take into account process to occur
     early in the planning stages of a federal undertaking when there is still a meaningful opportunity to
25   consider adverse impacts and mitigation measures."  *Id.* (quoting 16 U.S.C. § 470a-2).

26         [21] Judge Patel previously ruled that the Plaintiffs here have standing, but there was no
     declaratory judgment claim regarding the adequacy of the DoD's NHPA Findings pending at the
27   time, and so her previous ruling on standing (made in a far different procedural posture) is not
     binding on this Court.  *See Youngberg, on Behalf of Scientific Atlanta, Inc. Long Term Disability*
     *Plan v. Great West Life Assurance Co.*, 892 F.2d 85 (9th Cir. 1989) (noting that "a plaintiff may also
28   lose standing at any point during the litigation").

1    Critically, a "plaintiff must demonstrate standing separately for each form of relief sought."

2    *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. Inc.*, 528 U.S. 167, 185 (2000).  "Thus, a plaintiff

3    who has standing to seek damages for a past injury, or injunctive relief for an ongoing injury, does

4    not necessarily have standing to seek prospective relief such as a declaratory judgment."  *Mayfield*

5    *II*, 599 F.3d at 969 (citations omitted).

6         2.    Redressability of Plaintiffs' Declaratory Relief Claims

7    In order to establish standing for their declaratory relief claims, Plaintiffs must show a

8    favorable decision may redress their injuries.  *Lujan*, 504 U.S. at 560.  Plaintiffs must show there is a

9    "direct relationship between the alleged injury" they seek to remedy "and the claim sought to be

10   adjudicated."  *Linda R.S. v. Richard D.*, 410 U.S. 614, 618 (1973).  Here, the ultimate injury

11   Plaintiffs seek to remedy is the construction of the FRF and its impact upon the Okinawa dugong.

12   Admittedly, Plaintiffs' claim for declaratory relief seeks only a judgment that the DoD

13   violated the procedures required under the NHPA and an order setting aside the DoD's allegedly

14   flawed NHPA Findings.  The declaratory judgment claims seek in the first instance to vindicate

15   purely procedural injuries.  However, parties do not have standing to insist that procedural rules be

16   followed simply for the sake of enforcing conformity with legal requirements.  *See, e.g.*, *Citizens for*

17   *Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969 (9th Cir. 2003).  Instead, "a plaintiff

18   asserting a procedural injury must show that the procedures in question are designed to protect some

19   threatened concrete interest of his that is the ultimate basis of his standing."  *Id.*  Here, as noted

20   above, the concrete interest is the construction of the FRF and its possible impacts on the Okinawa

21   dugong.  *See id.*; *see also Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1225-

22   26 (9th Cir. 2008) (recognizing that the "concrete interest" at the heart of a lawsuit to enforce

23   specific procedures of the Endangered Species Act is the preservation and protection of the

24   endangered species).  In order to maintain this lawsuit for a declaration that DoD violated the

25   procedures of the NHPA, Plaintiffs must show a sufficient likelihood that the declaratory relief will

26   lead to the protection of this specific interest.

27   To be sure, where the statute allegedly violated prescribes rights and obligations of a

28   procedural nature, plaintiffs do not face a "high bar" to establishing redressability.  Plaintiffs are

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1    entitled to a presumption of redressability.  *Mayfield II*, 599 F.3d at 971.  A party alleging

2    procedural injury must show "only that the relief requested – that the agency follow the correct

3    procedures – *may* influence the agency's ultimate decision of whether to take or refrain from taking

4    a certain action."  *Salmon Spawning*, 545 F.3d at 1226-27 (emphasis added).  That said, the Ninth

5    Circuit has emphasized that "the redressability requirement is not toothless in procedural injury

6    cases."  *Id.* at 1227.  Indeed, *Salmon Spawning* itself is instructive as to when the redressability

7    requirement in procedural injury cases has bite.

8         In *Salmon Spawning*, three conservation groups challenged a National Marine Fisheries

9    Service (NMFS) biological opinion[22] under the APA.  *Id.* at 1224.  The "agency action triggering"

10   the NMFS to issue its biological opinion was the United States' decision to enter into a treaty with

11   the Canadian government to manage threatened or endangered salmon populations "originating in

12   Alaska, Canada, and the Pacific Northwest."  *Id.* at 1223-24.  The NMFS' biological opinion

13   "studied whether Canadian take under the levels permitted by the Treaty would jeopardize listed

14   salmon."  *Id.* at 1224.  The agency concluded that the "Canadian take under the Treaty was not

15   likely to jeopardize the continued existence of threatened or endangered salmon stocks."  *Id.*

16        The environmental groups sued, claiming the NMFS' biological opinion was "flawed" in

17   various respects that violate the APA, including section 706 (the same section invoked by Plaintiffs

18   here).  *Id.*  The Ninth Circuit unanimously concluded that the environmental groups lacked standing

19   to pursue this claim.[23]  Specifically, the panel ultimately concluded that the "relationship between

20   the [challenged executive action] and the Treaty sets up a dichotomy of interests that sinks the effort

21   to establish Article III standing" for the appellants' procedural injury claim.  The Court explained:

22        [I]f the groups were successful in establishing that NMFS failed to
           comply with the procedural requirements of ESA § 7 in deciding

23

24        [22] Sometimes referred to as a "BiOp."

25        [23] Although the Ninth Circuit opinion does not make the point clear, the plaintiffs in *Salmon
     Spawning* brought both injunctive relief and declaratory relief claims.  *See Salmon Spawning &*
26   *Recovery Alliance v. Carlos M. Gutierrez*, No. C05-1877-RSM, at ECF No. 1 ("Plaintiffs
     respectfully request that the Court: 1) Declare that the Defendants have violated the ESA and the
27   Administrative Procedures Act, and that the actions as set forth above are arbitrary, capricious, and
     not in accordance with law; [and] 2) Enter appropriate injunctive relief to ensure that the defendants
28   comply with the ESA and the Administrative Procedures Act . . . .")

whether the United States' entrance into the Treaty would jeopardize listed species, *the procedurally flawed consultation and defective BiOp could theoretically be set aside*. But, a court could not set aside the next, and more significant, link in the chain – the United States' entrance into the Treaty. *While the United States and Canada can decide to withdraw from the Treaty, that is a decision committed to the Executive Branch, and we may not order the State Department to withdraw from it.* So, while the groups correctly allege that they have a right to a procedurally sound consultation, they cannot demonstrate that 'that right, if exercised, *could* protect their concrete interests.'

*Id.* at 1226 (first and second emphases added) (third emphasis in original) (citing *Earth Island Inst. v. Christopher*, 6 F.3d 648, 652-53 (9th Cir. 1993) and then quoting *Defenders of Wildlife*, 420 F.3d at 957).

*Salmon Spawning* went on to note that "if a court were to give the groups the remedy that they seek – that NMFS and the State Department follow the proper procedures during a new § 7 consultation process – the ultimate agency decision of whether to enter the Treaty with Canada, made nine years ago, could never be influenced." *Id.* at 1227. Thus, "if we rule against the groups' claim of procedural injury, they will continue to suffer injury; and, if we rule in their favor, they will still suffer injury because we cannot undo the Treaty." *Id.* (citation omitted). The panel therefore affirmed the district court's dismissal of the procedural (APA) claim for lack of standing because "although we can set aside the BiOp, we cannot remedy the harm asserted." *Id.*

The Ninth Circuit reached a similar result in *Mayfield II*. 599 F.3d 964. Brandon Mayfield was a former suspect in the 2004 Madrid train bombings. *Id.* at 966. Mayfield was suspected because the FBI erroneously determined that his fingerprints matched those of the bomber. *Id.* Mayfield was arrested, and his home and office were searched pursuant to warrants issued under the Foreign Intelligence Surveillance Act (FISA), as amended by the PATRIOT Act. *Id.* at 966-67. Mayfield's computer and other electronic files were also searched pursuant to the Government's authority under FISA. *Id.* at 967.

After he was exonerated, Mayfield brought suit against the Government alleging various Fourth Amendment violations, including claims that he was subjected to unlawful searches, seizures, and surveillance pursuant to the FISA warrants. *Id.* at 967-68. Mayfield sought monetary damages, injunctive relief, and a declaration that certain provisions of FISA were unconstitutional. *Id.*

**United States District Court**

For the Northern District of California

1    Mayfield and the Government eventually settled all but the declaratory judgment claims.[24]  *Id.* at

2    968.  The settlement agreement provided that "the sole relief Mayfield could seek or that the court

3    could award with regard to [his remaining claim that parts of FISA are unconstitutional] would be a

4    declaratory judgment."  *Id.*

5         Pursuant to the settlement agreement, Mayfield filed an amended complaint seeking only "a

6    declaratory judgment that 50 U.S.C. §§ 1804 and 1823, as amended by the PATRIOT Act, are

7    facially unconstitutional."  *Id.* at 969.  Mayfield alleged that the government used the challenged

8    statutory provisions of FISA "to conduct covert surveillance, searches of the family's private

9    quarters, and seizures of the family's private materials.  Mayfield further asserted that because the

10   government obtained these materials unlawfully, and even though the government returned the

11   physical materials [seized], the continued retention of any derivative material was also unlawful."

12   *Id.*  Thus, as the Ninth Circuit later explained, the purpose of Mayfield's desired declaratory

13   judgment was "twofold: 1) to prevent future uses of FISA against Mayfield; and 2) to force the

14   government to return or destroy all derivative materials in its possession obtained from Mayfield by

15   unconstitutional means."[25]  *Id.*

16        The district court found that Mayfield had standing to pursue his declaratory relief claim

17   because the Government's "continued retention of derivative material from the FISA seizure" was a

18   constitutionally significant ongoing injury.  *Mayfield I*, 504 F. Supp. 2d at 1034.  The district court

19   further concluded that it could adequately redress Mayfield's claimed injury because, if the court

20   entered a declaratory judgment "finding the challenged portions of the Patriot Act unconstitutional,

21   *it is reasonable to assume* that the Executive Branch of the government will act lawfully and make

22   all reasonable efforts to destroy the derivative materials when a final declaration of the

23

---

24        [24] Among other things, Mayfield received $2 million in compensatory damages and an
     apology from the Government.  *Id.* at 968.
25

26        [25] The "derivative material" at issue included such items as "photocopies or photographs of
     documents from confidential files in Mayfield's law office, summaries and excerpts from the
27   computer hard drives from the Mayfield law office and plaintiff's personal computer at home,
     analysis of plaintiffs' personal bank records and bank records from Mayfield's law office . . . [and]
     summaries of confidential conversations between husband and wife."  *Mayfield v. United States*
28   (*Mayfield I*), 504 F. Supp. 2d 1023, 1034 (D. Or. 2007).

**United States District Court**
For the Northern District of California

1  unconstitutionality of the challenged provisions is issued." *Id.* (emphasis added). The Ninth Circuit

2  disagreed.

3  Although Mayfield was "entitled to a presumption of redressability," the Ninth Circuit

4  concluded that Mayfield lacked standing to maintain his declaratory judgment action because there

5  was no reasonable likelihood that the relief sought would redress his injury. *Mayfield II*, 599 F.3d at

6  971. The panel noted that because the Government "would not necessarily be required by a

7  declaratory judgment to destroy or otherwise abandon the [derivative] materials," a declaration that

8  the challenged portions of FISA are unconstitutional would be of "no direct consequence" to

9  Mayfield. *Id.* at 971-72. And as the panel explained, where any "prospective benefits" of a court

10  order "'depend on an independent actor who retains broad and legitimate discretion the courts

11  cannot presume either to control or predict,'" a plaintiff lacks standing to judicially seek those

12  benefits. *Id.* at 972 (quoting *Glanton ex rel. Alcoa Prescription Drug Plan v. AdvancePCS, Inc.*, 465

13  F.3d 1123, 1125 (9th Cir. 2006)). The panel hence concluded:

> Having bargained away all other forms of relief, Mayfield is now
> entitled only to a declaratory judgment. Although it is undisputed that
> the government retains materials derived from the FISA searches and
> surveillance of Mayfield's property, the only relief that would redress
> this alleged Fourth Amendment violation is an injunction requiring the
> government to return or destroy such materials. Under the terms of the
> Settlement Agreement, Mayfield cannot seek injunctive relief. Nor is
> it likely that the government will return the materials of its own
> volition, as it is under no legal obligation to do so, and has stated in its
> brief that it does not intend to take such action.

20  *Id.* at 972. Thus, the Ninth Circuit held that in light of the "limited remedy left open [to Mayfield]

21  and the absence of any authority on which the district court could rely to insist *sua sponte* that the

22  derivative materials be returned or destroyed, we must conclude that Mayfield lacks standing to

23  pursue his [declaratory judgment] claim." *Id.* at 973.

24  Plaintiffs' declaratory judgment claims are in a very similar posture to the claims the Ninth

25  Circuit dismissed in both *Salmon Spawning* and *Mayfield*. This Court has determined that no

26  injunctive relief may be issued to prevent or halt construction of the FRF. Moreover, the NHPA

27  "take into account" process is only hortatory, mandating no particular result. *Okinawa Dugong*, 543

28  F. Supp. 2d at 1095 (explaining that the NHPA "does not require a particular outcome and it neither

36

**United States District Court**
For the Northern District of California

forbids destruction of a protected property nor commands its preservation").  Hence, there is no likelihood that the United States government, in response to an adverse declaratory judgment, will voluntarily halt construction of the FRF.  As a result, it cannot be said that declaratory relief "may" provide redress to Plaintiffs.  *Salmon Spawning*, 545 F.3d at 1226-27.

As in *Salmon Spawning*, the "ultimate agency decision" to agree to the Roadmap and build the FRF at Camp Schwab has already been made, and it is highly unlikely that an order requiring the DoD to revise or reconsider its NHPA Findings will change that decision.  545 F.3d at 1227.  And for the reasons stated above, this Court cannot issue an injunction ordering the Government to pull out of the Roadmap or otherwise alter its plans for the FRF.  *See* Section II.C, *supra*.  Thus, "if we rule against the [Plaintiffs'] claim of procedural injury, they will continue to suffer injury; and, if we rule in their favor, they will still suffer injury because we cannot undo the [Roadmap]."  *Salmon Spawning*, 545 F.3d at 1227.  *Cf. Lujan*, 504 U.S. at 569-71 (plaintiffs failed to establish redressability because there was no reason to believe the funding agencies which had not been sued would "be obliged to honor an incidental legal determination the suit [against the Secretary of the Interior] produced; funding agencies not bound by any determination as to the Secretary's duty of consultation).[26]

Plaintiffs' suggestion, echoed in the (later reversed) district court in *Mayfield I*, that their injuries can be redressed because the Executive *might* change his mind with respect to the FRF's impacts on the dugong if this Court were to order DoD to conduct a renewed and more fulsome inquiry under the NHPA is thus completely unsupported and speculative.  "[W]here an independent actor "retains broad and legitimate discretion" to act that the court "cannot presume either to control or predict," the Court lacks constitutional power to adjudicate the merits of the controversy.  *Mayfield II*, 599 F.3d at 972 especially where, as here, there is no likelihood the Government will change its conduct in response to a declaratory judgment.

---

[26] *See also Linda R.S.*, 410 U.S. at 618 (affirming dismissal on redressability grounds of suit for unpaid child support where the only relief a court could fashion would be to imprison the delinquent parent, not order that he actually make child support payments).

In sum, because any declaratory relief will not "influence the agency's ultimate decision of whether to take or refrain from taking a certain action," *Salmon Spawning*, 545 F.3d at 1226-27, Plaintiffs lack standing to seek declaratory relief.

### III.   CONCLUSION

Plaintiffs' action is dismissed with prejudice.  The injunctive relief claims present non-justiciable political questions, and Plaintiffs lack standing to pursue their remaining declaratory relief claims.  The Clerk is directed to enter judgment and close the file.

This order disposes of Docket No. 163.


IT IS SO ORDERED.


Dated:  February 13, 2015

_____
EDWARD M. CHEN
United States District Judge